**UNITED STATES of America, Plaintiff,**

v.

**LOUISIANA–PACIFIC CORPORATION, Defendant.**

**Civ. No. 81–813–RE.**

United States District Court,
D. Oregon.

Dec. 28, 1982.

Charles H. Turner, U.S. Atty., Jack G. Collins, Asst. U.S. Atty., Portland, Or., Benjamin P. Schoen, Consumer Affairs Section, Antitrust Div., Dept. of Justice, Washington, D.C., Daniel Wellington, F.T.C., Washington, D.C., for plaintiff.

Clifford N. Carlsen, Jr., Michael E. Arthur, Miller, Nash, Yerke, Wiener & Hager, Portland, Or., for defendant.

## OPINION

REDDEN, District Judge:

Plaintiff United States of America seeks to impose a civil penalty upon defendant Louisiana-Pacific Corporation ("L–P") for its violation of a Consent Order requiring L–P to divest itself of a manufacturing plant in Rocklin, California (hereafter "Rocklin"). It is undisputed that L–P did not in fact divest itself of Rocklin as it had agreed to do. The United States seeks a civil penalty of an amount in excess of $6 million.

## I. BACKGROUND

In 1978, the Federal Trade Commission ("Commission") began an investigation into the anticompetitive effects of a proposed

merger between L–P and the Fibreboard Corporation ("Fibreboard"). After extensive negotiation between L–P and the Commission, a settlement was reached. On June 26, 1978, L–P and the Commission signed an "Agreement Containing Consent Order" ("Agreement"), FTC Docket No. C–2956. The Agreement contained the full text of a proposed Consent Order which required L–P to divest its plant in Rocklin, California. By signing the Agreement, L–P agreed to waive:

(a) any further procedural steps;

(b) the requirement that the Commission's decision contain a statement of findings of fact and conclusions of law; and

(c) all rights to seek judicial review or otherwise to challenge or contest the validity of the order entered pursuant to th[e] agreement.

Agreement Containing Consent Order at 1. Further, by signing the Agreement, L–P agreed to abide by all provisions of the Consent Order.

On February 27, 1979, with L–P's consent the Commission issued an administrative complaint and a Consent Order ("Order"). The Order, which was identical to that in the Agreement, became final on March 28, 1979. It required L–P to divest its medium density fiberboard (MDF) plant at Rocklin, California within two years, to an acquirer approved in advance by the Commission. The requirement to divest was absolute and unconditional. The Commission, in return for L–P's agreement to divest the Rocklin MDF plant pursuant to the terms in the Order, terminated its investigation of the L–P/Fibreboard merger.

In February 1980, L–P, pursuant to section 5(b) of the Federal Trade Commission Act, 15 U.S.C. § 45(b), filed a petition to reopen proceedings for the purpose of modifying the Order. This petition, which was amended by letter of June 11, 1980, sought to have the Order modified to eliminate the requirement that L–P divest the Rocklin plant. L–P contended there were changes in fact and law sufficient to warrant modification of the Order to eliminate the divestiture requirement. The Commission, on June 26, 1980, denied L–P's petition to reopen.

On February 27, 1981, L–P requested that the Commission extend by 18 months the time within which it could comply with the divestiture provision. On March 27, 1981, the Commission denied L–P's request for an extension of time. On March 28, 1981, the date by which L–P was to have divested the Rocklin plant, L–P still retained the plant.

On June 25, 1981, three months after the compliance period had ended, L–P filed another petition to reopen and modify the Order. This second petition incorporated the first petition *in toto* and alleged additional changed facts and law which L–P argued were sufficient to warrant reopening of the Order and modification or elimination of the divestiture requirement. The Commission denied the second petition to reopen on July 31, 1981.

## II. PROCEDURAL HISTORY OF THE CASE

On September 4, 1981, the United States filed a complaint against L–P seeking civil penalties and mandatory injunctive relief pursuant to section 5(*l*) of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45(*l*). The complaint charged L–P with violating the Order of the Federal Trade Commission by failing to divest the Rocklin MDF plant as required under the Order.

On October 1, 1981, defendant L–P filed its answer to the government's complaint and also filed a counterclaim. The counterclaim alleged that the Commission improperly denied L–P's second petition to the Commission to reopen and modify the Order to eliminate the requirement to divest. The counterclaim essentially sought two remedies: first, that no penalties be assessed against L–P for failing to divest as required by the Order; and second, that the Court hold the Commission's denial of the second petition to reopen the Order arbitrary or capricious or not in accordance with law

and remand the matter to the Commission for reconsideration.

On December 15, 1981, the United States filed its Reply to the Counterclaim, denying the allegation that the Commission's refusal to reopen the Order pursuant to L–P's second petition to reopen was improper.

On December 28, 1981, the United States moved for summary judgment on its affirmative claim. Oral argument was held on February 16, 1982. The government's motion was granted on February 23, 1982. This Court held that L–P violated the Order by not divesting Rocklin by March 28, 1981. L–P did not in fact contest this aspect of the government's case, i.e., the fact that L–P had not divested Rocklin.

On February 26, 1982, the United States moved for summary judgment on L–P's counterclaim. Oral argument was heard on that motion on April 19, 1982. This Court granted the government's motion for summary judgment on the counterclaim in an Opinion and Order of May 3, 1982, holding that the Commission's action in denying L–P's petition to reopen was not wrongful and that there was substantial evidence in the record to support the Commission's denial.

The issue now before the court is the amount of the penalty [1] to be assessed L–P for violating the Order, and whether equitable remedies should be imposed to enforce said order.

## III. THE APPLICABLE LAW

■ This court has discretion to determine the amount of the penalty to be imposed for violation of the divestiture order. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 229 n. 6, 95 S.Ct. 926, 930 n. 6, 43 L.Ed.2d 148 (1975); *United States v. J.B. Williams Co.,* 498 F.2d 414, 438 (2d

Cir.1974). A civil penalty of up to $10,000 per day may be assessed for each day of the continuing violation. I follow established standards which aid me in the exercise of my discretion. The penalty must reflect the seriousness of the violation, must penalize offenders and act as a deterrent to others. *United States v. Floersheim,* 1980–2 Trade Cas. (CCH), ¶ 63,368 (C.D.Cal. 1980), *aff'd in an unpublished opinion,* 659 F.2d 1090 (9th Cir.1981); *United States v. Beatrice Foods Co.,* 351 F. Supp. 969, 971 (D.Minn.1972), *aff'd,* 493 F.2d 1259 (8th Cir.1974), *cert. denied,* 420 U.S. 961, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975). Congress did not intend a penalty that would be regarded by potential violators as "an acceptable cost," as opposed to a deterrent to violation. *United States v. ITT Continental, supra,* 420 U.S. at 231, 95 S.Ct. at 932.

■ I look at five separate criteria in my effort to arrive at a suitable penalty figure: (1) the good or bad faith of the defendant in violating the order; (2) the injury to the public resulting from a violation; (3) the benefits derived by the defendant from its violative activities; (4) the defendant's ability to pay a penalty; and (5) the need to deter similar behavior by the violator and others and vindicate the authority of the Federal Trade Commission and the integrity of its orders. *See, e.g., United States v. Reader's Digest Association, Inc.,* 494 F.Supp. 770 (D.Del.1980), *aff'd,* 662 F.2d 955 (3d Cir.1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982). *United States v. J.B. Williams Co., supra; United States v. Papercraft Corp.,* 393 F.Supp. 415, 420 (W.D.Pa.1975), *aff'd in part* and *rev'd in part,* 540 F.2d 131, 141 (3d Cir. 1976); *Federal Trade Commission v. Consolidated Foods Corp.,* 396 F.Supp. 1353, 1356–57 (S.D.N.Y.1975); and *United States v. Swingline,* 371 F.Supp. 37 (E.D.N.Y.1974).

---

1. Section 5(*l*) of the Federal Trade Commission Act, 15 U.S.C. § 45(*l*), states:

   Any person, partnership, or corporation who violates an order of the Commission after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than *$10,000 for each violation,* which shall accrue to the United States and may be recovered in

a civil action brought by the Attorney General of the United States. Each separate violation of such an order shall be a separate offense, except that in the case of a violation through continuing failure to obey or neglect to obey a final order of the Commission, *each day of continuance of such failure or neglect shall be deemed a separate offense.*
(Emphasis added).

I allocate to the United States the burden of proof on these five issues.

## IV. DISCUSSION

### A. *Good or Bad Faith*

Thorough and extensive briefings, numerous hearings and conferences, hundreds of exhibits and three days of trial revealed an extensive history of the defendant's unsuccessful attempts to divest Rocklin within the period allowed. The plaintiff takes the position that those efforts were inadequate, indeed minimal, and did not constitute good faith efforts to comply with the consent decree. The defendant is equally adamant that it did everything it could to divest itself of the plant, but that circumstances beyond its control prevented the divestiture. The most pertinent of the information will be discussed below.

It was the intention of the defendant to acquire Fibreboard, and it succeeded in this effort in March of 1978. This acquisition included the acquisition of Rocklin. Rocklin's book value, *as reflected by Fibreboard,* was $8.46 million. The agreement between these parties was signed June 26, 1978 with defendant agreeing to divest Rocklin and plaintiff agreeing to drop its investigation and any opposition to the L–P—Fibreboard merger. Various values were placed upon Rocklin: its book value of $11.7 million;[2] a "tax basis" of $12 million;[3] an estimated sale price/fair value of $20 million; a "replacement" value of $21 million; an "in-house" evaluation of $12–$15 million; an "independent" appraisal price of $35 million, a "probable value" of $6–8 million[4] and asking prices of up to $40 million. The only conclusion supported by the evidence is that Rocklin was worth what defendant could get for it. On February 27, 1979, the Order was entered. It became final on March 28, 1979, and the defendant had two years, until March 28, 1981, to complete divestiture. As of the trial of this case, which commenced on the 4th day of November, 1982, defendant had not yet fully complied.

The record reflects the following facts which are most relevant on the issue of good or bad faith. The parties frequently point to the same fact to prove what one regards as evidence of good faith, and the other of bad faith.

Defendant took no preparatory actions between the signing date of June 26, 1978 and the filing date of the consent Order of February 27, 1979. The Order became final on March 28, 1979 and defendant had two years to comply. The first real efforts took place in July of 1979, although inquiries were responded to prior to that month. Defense witnesses testified that they responded to inquiries and built a file of potential purchasers. On July 31, 1979, defendant sent a packet of material to twelve entities it considered potential purchasers. The asking price was $35 million for the plant, cash at closing. The government contends that the asking price was designed to be so high as to discourage offers, while the defendant claims that it was a fair asking price. The government contends that the defendant should have sought professional help (investment bankers or brokers) and contacted a larger number of potential purchasers—certainly more than just twelve. Defendant contends it was traditional to act as its own broker and that it knew all of those who would be both interested and capable of the purchase of Rocklin. Defense witnesses testified that they were confident the plant would sell for their figure of $35 million, or close to it, within a brief period of time. In any event, the

---

**2.** *See* trial transcript at p. 57. L–P's book value of $11.7 million differs from Fibreboard's book value for Rocklin of $8.46 million due to investments in the plant made by L–P.

**3.** The use of such a "tax basis" is questionable in L–P's case. Due to favorable treatment of capital gains for timber corporations, L–P's tax rate is almost non-existent. In 1981, L–P paid no taxes on its earnings, despite net income of $26,280,000. *See* trial transcript p. 317; Exhibit 7 (1981 Annual Report of L–P) at p. 2.

**4.** *See* trial transcript at pp. 57–59. This was the estimate of Don Kayser, L–P's Vice-President of Financing and Administration, of the value of Rocklin when it was still owned by Fibreboard.

formal offers to sell which were issued on July 31, 1979, were, in effect, withdrawn on August 28, 1979, approximately one month later. At that time, the defendant sent the twelve potential purchasers a letter advising them that they were involved in another merger effort and could not take the time to negotiate the sale of Rocklin. Defense witnesses say that they were also considering a petition to the FTC which sought a modification of the divestiture order. They took the position that they had a proposition which would satisfy both the needs of the government and of itself and which they believed the government would accept. Defendant claims that these two facts, plus its confidence in its ability to sell at a good price, and in short order, demonstrate its good faith.

Harry Merlo, defendant's Board Chairman, testified that he had informally approached the FTC with his proposition.[5] Defendant had received legal advice from an attorney, well versed in FTC proceedings, to the effect that the FTC would likely agree to a modification. The FTC denied the petition, however. In the fall of 1979, defendant pumped $3.4 million into Rocklin under a plan approved in June of 1979, four months after the order entered. Defendant claims that these expenditures were to make Rocklin saleable. The plaintiff claims that these expenditures proved that defendant had not yet concluded that it would ever be required to divest.

It was not until July of 1980 that defendant officially put Rocklin back on the market. It did so by corresponding with selected prospective purchasers. Although the plant had not been "marketed" since August of 1979, defendant claims that any offer, inquiry or request for inspection would have received prompt attention. Their correspondence did not indicate such, nor did they invite offers, inquiries or inspections. The United States proved by a preponderance of the evidence that L–P did not make any significant effort to divest prior to July of 1980, when the divestiture period had already run for almost a year.

The government points out, quite appropriately, that from August of 1979 through July 9, 1980, which is 40% of the two year divestiture period, Rocklin was "off the market." Defendant challenges the claim but does admit that its efforts lacked the maximum effort during those months.

The asking price, in July of 1980, was increased to $40 million. Defendant contends that the price reflected additional investment in Rocklin, as well as the inflation factor and its effect upon replacement costs. The plaintiff contends that raising the price guaranteed that there would be no divestiture. The government points out that on April 10, 1980, June 26, 1980, December 18, 1980, and February 5, 1981, the FTC staff wrote to defendant, warning it that time was running out and that the obligation to divest was absolute. The defendant was also warned that a penalty proceeding such as this one would be instituted if it failed to comply with the consent decree. The July 1980 offer to sell ($40 million) was sent, by defendant, to only *seven* potential purchasers. No offers were received in response to these letters and, in November of 1980, defendant put Rocklin up for bid. Only those who had previously expressed a serious interest in Rocklin were contracted and asked to bid. Three bids were received, all of which were in the $20–$25 million range. Defendant *rejected* all three bids. Defendant did not correspond with any of the bidders, but its officers did testify that contact was made with Roseburg Lumber, by telephone, to ascertain whether or not Roseburg Lumber would "get its figure up to the $30 million

---

5. L–P hoped to persuade the FTC to allow L–P to close certain other plants, in Ukiah, California, and in the southern part of the United States, which produced primarily particleboard. The Rocklin plant produces Medium Density Fibreboard (MDF), a similar product, but with properties which are far superior to regular particleboard. MDF's advantages over particleboard are such that Mr. Merlo described MDF as "the product of the future" in the compressed-wood field. Mr. Merlo presented his plan to three Commissioners. The FTC rejected the proposal to allow L–P to keep Rocklin's MDF potential by divesting itself of particleboard capacity. *See* trial transcript at p. 247 and p. 37.

vicinity." Roseburg Lumber Company declined. Defendant claims that the bids were rejected as "too low," and asserts that acceptance of such bids would have violated management's perceived duty to shareholders. Defendant also excuses its rejection of the Roseburg Lumber bid on the grounds that a condition of that bid was that L–P was to terminate all Rocklin employees. Defense witnesses testified that they felt acceptance of this condition would violate their perceived duty towards those employees. However, in their attempts to negotiate with Roseburg Lumber by telephone following receipt of the bid, there was no discussion of the employee situation. L–P simply sought a higher price and did not refer to a concern for the employees.

Four months remained in the divestiture period, but defendant's record of efforts to sell before expiration is nonexistent. Defendant was in violation on March 28, 1981. On April 21, 1981, it again attempted to negotiate with Roseburg Lumber. Defendant continued to ask $40 million for the plant in its sporadic correspondence in the months following March of 1981. The books reflect that interest rates had spiraled and that profits at Rocklin had been drastically reduced by that time.

Defendant cites high interest rates as the reason for the lack of offers. The United States concedes interest rates were at very high levels, but urges convincingly that this factor should have caused L–P to accept the $20 million bid for a plant with a book value of $8½ million to $12 million.

Defendant eventually consulted an investment broker in September of 1981. That individual was of no assistance. His action in L–P's behalf was perfunctory, and merely involved a review of L–P's efforts to date and the statement that they were sufficient. This individual spent a part of one day working on the problem.

Defendant's witnesses testified generally that they were not "concerned" about their ability to comply by a sale of the plant until the bids were rejected in November of 1981. Then, the industry was in such bad shape that a reasonable sale was, they felt, impossible.

Finally, it should be noted that on the eve of trial, counsel for L–P informed the court that L–P had concluded an agreement "in principle" to sell Rocklin to Roseburg Lumber Co. for $15 million. It is not known whether this will be an approved divestiture.

Defendant's efforts to sell and comply were minimal. I find that defendant hoped that various petitions to the FTC, as well as an amendment to the statute, would result in a modification of the order to divest. The FTC, however, never encouraged this hope but, as a matter of fact, repeatedly warned the defendant that this day was coming. I am required to find, and do find, that defendant did not, in good faith, attempt to divest itself of Rocklin. During the prescribed period L–P's officers did have, from time to time, reason to believe that they could defer sale and still comply. As reasonable businessmen they could have believed that the FTC might modify the order or extend the period of divestiture. However, defendant's conduct, from the signing of the order until the final date of the divestiture, viewed in its entirety, indicates a failure to make good faith efforts to comply.

The asking price was too high. It was set at a figure which, if not completely discouraging to potential purchasers, certainly did not encourage them. It is worthy of note that defendant was warned on four separate occasions by plaintiff, and plaintiff also advised L–P that L–P's desire for a subjectively desired price was not to be pursued in disregard of the Order. Defendant failed to reduce the price as time was expiring and, in fact, increased the price with time running out. Further, it maintained the demand for $40 million even after the divestiture period had expired.

B. *Public Harm*

No issue is more hotly contested than this. L–P contends that the government has been wrong from the outset and, further, that new "guidelines" employed by

the United States Department of Justice would have allowed L–P to acquire Fibreboard, without divesting Rocklin. The plaintiff protests this reasoning, pointing out that L–P chose not to contest the earlier allegations, signed a consent order and waived its right to challenge the original action. I do not consider the correctness of the government's position in filing its initial administrative complaint. I do not question the motives or wisdom of L–P's signing of a consent order. They did so, and it must be assumed that divestiture would have enhanced competition and decreased centralization. *See United States v. Reader's Digest, supra,* at 969; *United States v. Papercraft, supra,* at 426–427. It is true, nevertheless, that minimal harm was inflicted upon the public. This may well have come about from the disastrous turn in the economy, and its effect on the timber industry, but nonetheless there seems to have been little public harm resulting from L–P's failure to divest Rocklin. Therefore, I find that public harm, which I assume, is not a factor in determining the size of the penalty. *Federal Trade Commission v. Consolidated Foods, supra,* at 1357.

## C. *Benefit to L–P*

I must consider the benefits which flow to L–P because of retention of Rocklin. The most obvious method of measurement is profit to L–P resulting from acquisition, retention and operation of Rocklin. As might be expected, the parties' calculations and computations differ, and their conclusions are mutually inconsistent. It *is* clear that the profits L–P realized from Rocklin diminished with the passage of time during the divestiture period. Defendant insists that benefits, i.e., earnings, prior to the divestiture deadline of March 27, 1981 must be ignored, and that earnings from that date to the present are the sole test. I disagree. During the divestiture period, the projected profits from Rocklin were sufficient to exceed the maximum penalty which can be assessed in this case, i.e., $3.65 million per year.[6] I consider those benefits in my decision and will refer to L–P's lack of incentive in my discussion regarding deterrence. The market has deprived L–P and its industry competitors of their high cash earnings of late, but defendant has, in fact, benefited from holding and operating Rocklin, even *after* the divestiture deadline. From expiration to August of 1982, defendant admitted profits from Rocklin of $548,-683.00.[7] Plaintiff correctly points out that L–P still has Rocklin as an asset and is still negotiating for a profitable disposition. I find that L–P has benefited from retention of Rocklin and this is an element I will consider in assessing the penalty.

## D. *Ability to Pay*

In spite of an economy that has devastated defendant and its competitors, L–P remains a strong company in excellent financial condition. The 1981 sales and 1981 assets each exceeded $1 billion. Its 1981 net income was over $26 million. This year, 1982, will not be a good year, however, and L–P contends it will be required to borrow in order to pay any substantial penalty. Plaintiff, however, points to the recent acquisition by defendant of stock in National Gypsum. Defendant acquired National Gypsum stock with a cash outlay of $7 million over a four day period.[8] Plaintiff also points to L–P's "jet plane fleet" of seven aircraft as a source of assets convertible to cash. I find that L–P has the ability to pay even the maximum fine without, as L–P admits in its 1981 annual report: "a

---

6. *See* trial transcript at p. 211. Rocklin had profits of $4 million in 1979 and had projected profits of $4.2 million in 1980. The maximum penalty which may be assessed in this case is $3.65 million per year.

7. *See* trial transcript at pp. 264–265.

8. At the time of trial the total value of L–P's stock in National Gypsum was between $55,-000,000 and $60,000,000. In four consecutive trading days early this year, L–P acquired over 220,000 shares in National Gypsum. *See* trial transcript at pp. 375–376.

materially adverse effect on [its] business or financial condition . . ." [9]

### E. *Deterrence and Vindication*

Another objective in arriving at the fine to be assessed is the deterrence of the violator and others, as well as vindication of the plaintiff FTC. I have concluded that L–P fell short of good faith in its attempts to divest Rocklin and a deterrent is called for—one that will deter L–P in the future as well as others that would regard a modest penalty as an acceptable cost of doing business. Delay in compliance must be discouraged, not encouraged. There must be an incentive to comply with such orders. *United States v. Papercraft, supra,* at 420 and 426; *United States v. ITT Continental Baking, supra,* at 932.

Further, vindication of the FTC is an important element. Congress has armed the FTC with powers and responsibilities and its orders should not be disregarded with impunity. *Federal Trade Commission v. Consolidated Foods Corp., supra,* at 1357. Defendant argues that changes in the national administration and in the Department of Justice mean that the FTC would not be authorized to order the divestiture today that L–P agreed to in 1978. I know of no authority to consider such speculations in this case. In fact, the present administration has pursued this case vigorously.[10]

## V. INJUNCTIVE RELIEF

This court denies, for the present, plaintiff's request for an injunction and appointment of a trustee to pursue divestiture. A status conference will be scheduled approximately 30 days from issuance of this opinion and order to determine whether either request will be necessary.

## VI. CONCLUSION

■ I have found that L–P failed to exercise good faith in the divestiture of Rocklin; that there has been minimal injury to the public as a result; that L–P derived substantial benefits from retention of Rocklin; that L–P has the ability to pay even the maximum penalty; and that the deterrence and vindication factors warrant the maximum penalty.

I also realize that there has not been a worse time to sell, a worse market or tougher financial times for L–P in its relatively short business history. However, as to the Rocklin divestiture this case and the FTC's unrelenting drive for the maximum penalty show that defendant was, and remains, overly optimistic.

I find that for reasons stated throughout this opinion the *maximum* penalty is not warranted. I also find, however, for reasons stated throughout this opinion, that a substantial penalty is warranted. I therefore conclude that the penalty to be assessed herein shall be $4 million, which is an amount both justified and required.

---

9. L–P will also soon be the recipient of a payment from the government in the amount of $210 million for timber lands acquired for the Redwood National Park in California. It was this acquisition by the government which led L–P to pursue the Fibreboard merger in order to replace the timber lands sold to the government. L–P acquired Fibreboard, which includes timber resources comparable to those sold to the government, as well as the Rocklin plant, the Northstar ski resort at Lake Tahoe, and numerous other assets, for $185 million. *See* trial transcript at pp. 24–25, 62, 276.

10. At the time of trial, L–P also sought to introduce into evidence certain letters from counsel for the government. The asserted basis for the offer was that the government had delayed bringing this action for some period of time, and that this exercise of prosecutorial discretion had prejudiced L–P. Over the objection of the government that these documents were irrelevant, I did in fact examine them. They reveal that the government has prosecuted this case expeditiously.