UNITED STATES of America, Plaintiff,

v.

PHELPS DODGE INDUSTRIES, INC., General Cable Corporation, the Okonite Company and the Anaconda Company, Defendants.

No. 78 Civ. 4479 (ADS).

United States District Court,
S.D. New York.

June 14, 1984.

Benjamin P. Schoen, Lawrence G. McDade, Consumer Affairs Section, Antitrust Div., Dept. of Justice, Selig S. Merber, R. Scott Wynn, Bureau of Competition, F.T.C., Washington, D.C., for plaintiff.

Simpson, Thacher & Bartlett, New York City, for defendant GK Technologies, Inc.; Charles E. Koob, John F. Cambria, Morgan F. Kelly, New York City, of counsel.

Debevoise & Plimpton, New York City, for defendant Phelps Dodge Industries, Inc.; Robert L. King, Michael E. Wiles, New York City, of counsel.

## CORRECTED OPINION AND ORDER

SOFAER, District Judge:

The United States brought this civil action in September 1978 for monetary penalties and injunctive relief, pursuant to section 5(*l*) of the Federal Trade Commission Act, 15 U.S.C. § 45(*l*), against defendants Phelps Dodge Industries, Inc., a successor to Phelps Dodge Copper Products Corporation; General Cable Corporation, now known as GK Technologies, Inc. ("GK"); the Okonite Company; and the Anaconda Company. The complaint charges that the defendants violated a 1936 Federal Trade Commission cease-and-desist order ("the Order"), which prohibited price fixing and coordination in the paper cable industry. In November 1979 a final judgment providing for a civil penalty of $300,000 and injunctive relief was entered against Okonite by consent. In January 1980 the remaining defendants unsuccessfully moved to dismiss the complaint on the ground that it failed to state a claim upon which relief could be granted, and extensive discovery ensued. In January 1982 a final judgment providing for a civil penalty of $100,000 and injunctive relief was entered by consent against Anaconda. In January 1983 the remaining parties agreed to submit the entire cause for final judgment on an agreed record.

The Order which the government argues the companies' conduct violated originated in an administrative proceeding instituted by the FTC on September 26, 1935, against defendants or their predecessors, and other companies no longer in the industry. The Order has remained in force since it became final in May 1938. The government charges that Phelps Dodge, GK, Okonite, and Anaconda violated the first, second, and fourth decretal paragraphs of that Order, which prohibit competitors from conspiring to fix or maintain prices, to adhere to prices in price sheets circulated among them, or to conduct investigations to ferret out and discourage deviations from such prices.[1] The findings and conclusions that

---

1. The Order provides in relevant part:

IT IS FURTHER ORDERED that said respondent corporations ... General Cable Corporations ... Habirshaw Cable and Wire Corporation ... The Okonite Company, Phelps-Dodge Copper Products Corporation ... and their successors, officers, agents and employees, and the respondent, National Electrical Manufacturers Association, cease and desist, in connection with the business of selling and offering for sale impregnated paper cable, ... in interstate commerce, from doing and performing, by agreement, combination or conspiracy between or among any two or more of said respondent corporations acting directly or by or through the respondent, National Electrical Manufacturers Association, the following acts and things:

(1) Fixing, maintaining or enhancing prices, special charges, discounts, transportation charges or any terms or conditions of sale

follow establish that defendants violated the 1936 Order by conspiring to fix and maintain prices in the paper cable industry. Civil penalties are assessed against Phelps Dodge and GK in the amounts of $517,500, and $552,000, respectively.

### I. *Findings of Fact*

#### A. *The Paper Cable Industry, Market, and Price Book.*

Impregnated paper cable is electrical cable used for the transmission of high voltage electricity from a generation point to a distribution point. Order ¶ 2. It is generally made to specifications set by the purchaser from strands of copper or aluminum sheathed with a paper insulation. During the period between 1970 and 1975, the four defendants originally named in this action made over ninety percent of the paper cable sold in this country. Their products were essentially fungible, and their customers primarily public and private utilities.

For some time paper cable pricing has been based on data in a price book, an "historical formula which people have used in the industry as a basis for pricing their products." Priesing at 98. The price book formula in the 1970s reflected costs of labor, materials, and manufacturing, as well as a margin of contribution, for given industry specifications of paper cable. Priesing at 98–103. Book pricing was simply a shorthand method of determining the cost of a product generally manufactured to customer specification. Cowles at 40, 165–67. The price book contained a base price for specifications of paper cable, as well as a series of price sheets listing the adjustments to that price because of such factors as the cost of metal and other product components.

Three paper cable price sheets are most important in this litigation: the quantity discount sheet, which specified percentage discounts for various quantities of cable; the freight adder sheet, by which shipping charges were calculated; and the jacket adders, which listed the prices of the coverings, or jackets, for the paper cable, and which varied according to the type and thickness of paper insulation used. The price book served to simplify paper cable pricing by providing a means of separately pricing product components. The 1936 Order described the price sheets then in circulation, however, as "exceedingly complex and detailed." *In re National Electrical Manufacturers Assn.*, Findings of Fact ¶ 4(a) (No. 2565 Dec. 29, 1936). Generally, no more than a handful of people in any paper cable company were capable of calculating the book price for a given order. Cowles at 206, 209.

Occasionally, one of the four major domestic producers would issue a revised price sheet and send it to its three major competitors, who typically would revise their own price sheets to conform to the new standard. This practice caused the companies' price books to remain identical: the list price for any given order generally would not vary from company to company. But the companies did not always charge the book price. When market conditions demanded, the companies would bid "off-book," either by discounting the book price by some percentage, Jackson at 111; by utilizing cost-plus pricing from individual component costs, Penhale at 25–26; Jack-

which terms or conditions constitute a substantial element in competition;
(2) Providing that any price lists compiled and distributed by any of them among their competitors are to be adopted and adhered to until modifications thereof are similarly compiled and distributed with the result that such original lists and amendments are so adopted and adhered to by any of them and their competitors; ...
(4) Participating with competitors in initiating or conducting any investigation for the purpose of ascertaining and reporting for their joint benefit if, when and to what extent any competitor has deviated from any price list or any announced or quoted price, or otherwise bringing pressure or persuasion to bear upon competitors not to deviate from any such price list or price, provided that this paragraph shall not prevent the circulation of reports of the prices, terms, conditions and like particulars of closed transactions, when not done for the purpose of policing the activities prohibited in paragraphs (1) or (2); ...

*In re National Electrical Manufacturers Ass'n* (No. 2565, Dec. 29, 1936).

son at 25–26, 128–32; or by employing some combination of book and cost-plus pricing, Jackson at 129–30; Penhale at 28; Kedzierski at 107. Each of these methods was responsive to competitive pressures; manufacturers could at any time reduce or increase the discount from book, or adjust their profit above (or loss below) cost. Employed in this manner, the price book enabled manufacturers to base their prices on identical data, but still engage in competitive pricing.

Until around 1970 "the book was pretty much the golden rule," from which paper cable companies derived quotations "without exception." Jackson at 110. After 1970 the fortunes of the paper cable industry fluctuated widely, and so did the industry's adherence to the book. For most of 1973 pricing went off-book, but during the first half of 1974 demand was so strong that at times quotes went above book. Penhale at 29–30; Schell at 39. Beginning in 1975, while quotes remained on-book, considerable discounting took place. By late 1975 the industry was in a serious downturn. Pricing went entirely off-book, Penhale at 29–30; Schell at 38; Viggiano at 60; Cowles at 92–93, and occasionally even went below cost, Kedzierski at 107; *see* Brooks at 70. Costs escalated so rapidly that historical data on which the price book was premised no longer accurately reflected the market, and low demand made book-price increases untenable. Phelps Dodge explored the possibility of a total overhaul of the pricing system, Cowles at 94; Priesing at 103, but the price book proved superior to any other method contemplated, Cowles at 183; Priesing at 156. GK also considered alternative pricing strategies to increase the profitability of paper cable, but none was implemented because the market was believed incapable of supporting higher prices. Brooks at 73, 76, 78–79. Against this gloomy background in the paper cable industry, certain contacts occurred between officials of the defendant companies named Trotter, Kedzierski, and Penhale.

B. *Contacts Between Trotter, Kedzierski, and Penhale.*

In April 1976, when demand for paper cable had been falling for some eighteen months, James Trotter was Product Manager for paper cable at Phelps Dodge and Leo Kedzierski held the same position with GK. Robert Flood, then of Phelps Dodge but formerly of GK, phoned Kedzierski to arrange a meeting between him and Trotter at the Hilton Hotel in Tarrytown, New York. Flood claims he arranged the meeting solely because he knew that Trotter's job at Phelps Dodge was in jeopardy and wished to introduce Trotter to someone at GK in case he might want to seek employment there. Flood at 70, 132, 137–38. He admitted, however, that he did not mention this purpose to Kedzierski during their phone conversation or during his brief appearance to introduce them when they met. Instead, amidst "general comments about the state of the industry," Flood indicated to Kedzierski only that the two men should meet because "Jim Trotter was involved in paper cable pricing." Flood at 75. Kedzierski testified, moreover, that Flood, relating a discussion at Phelps Dodge at which the participants were lamenting the plight of paper cable, suggested that "it didn't have to be like that." Kedzierski at 102–03. Flood termed Kedzierski's account of the conversation "a little dramatic," but he conceded that he had spoken of the poor state of the paper cable product line and that Kedzierski might reasonably have construed the discussion as an invitation to cooperate. Flood at 72. At their initial meeting, Trotter and Kedzierski discussed Trotter's insecurity about his job with Phelps Dodge, which he thought hard times in the paper cable industry had put in jeopardy. Trotter at 352; Kedzierski at 262. But they also discussed the ailing state of the market for paper cable, book pricing, and ways to shore up the price. Kedzierski at 31; Trotter at 74–77.

Later in April, Kedzierski and Harry Penhale, then Vice-President for Quotations for paper cable at Okonite, arranged to meet at the Marriott Hotel in Saddlebrook, New Jersey. According to Trotter

and Kedzierski, Trotter was not present at this meeting. Trotter at 83, 387–88; Kedzierski at 38–39. Discussion focused primarily on the poor economic conditions then prevailing in the paper cable industry. Kedzierski testified that at this meeting Penhale supplied him with a copy of a new Okonite price sheet of "freight adders." Penhale recalled that he and Kedzierski had discussed the updated freight rates over the phone around this time, but that he had not actually provided Kedzierski with the sheet until a subsequent meeting attended also by Trotter, to whom he also gave a copy. Penhale at 80–83.

Penhale also recalled that at the April meeting Kedzierski had given him and Trotter each "a copy of some work he had done with respect to revisions in discounts on ... the cable coverings," or jacket adders. Penhale at 83. Kedzierski testified that at this initial meeting he had merely mentioned to Penhale that he was doing some work on jacket adders, that Penhale requested that he send them to him, and that at a later time he did so. Kedzierski at 41–42; 237; see Trotter at 74. Trotter did not think he had received the jacket adders at all, recalling that Kedzierski had indicated to him that he had abandoned the work. Trotter at 334. But his superior Richard Cowles, Vice-President of Sales and Marketing for the Phelps Dodge Cable and Wire Company, testified that about this time Trotter had showed him a tentative price sheet for jacket adders from another company, an incident of which he apprised Harry Schell, the President of the Cable and Wire Company. Cowles at 22–25. The evidence makes it likely, therefore, that Kedzierski provided Penhale and Trotter with copies of General Cable's proposed jacket adders.

Trotter also testified that during this period he received a copy of the Okonite freight rates and a quantity discount sheet. Trotter at 320–29. Penhale recalled that an exchange of freight rates occurred at the first three-way meeting. Penhale at 83. Trotter, however, testified that he received both documents through the mail sometime before the three companies is-

sued new price sheets in late May. Thus, the men agree that Penhale gave Trotter a copy of Okonite freight rates; and Trotter recalled receiving quantity discount sheets as well. Though Trotter's recollection of his receipt of these materials seems less than precise, see Trotter at 326–27, the testimony of Cowles and Schell confirms that Trotter received some type of price sheet from a competitor. Schell at 156–59; Cowles at 15–25. In sum, notwithstanding the divergence in details of the participants' testimony, the evidence establishes that the men exchanged internal pricing information in the hope of gathering support for imminent price increases.

Penhale, Kedzierski, and Trotter did not simply exchange price information, but by phone call and meeting developed an understanding that their respective companies would bid "on the book" and thus attempt in concert to hold the marketplace price to the levels established by the new pricing sheets. Initially, Trotter advised his cohorts that Phelps Dodge was considering issuing a new price sheet incorporating higher prices. Trotter at 79, 163, 328, 83. Penhale assured Trotter that if Phelps Dodge took the lead in issuing new price sheets, Okonite would support and follow them. Trotter had similar conversations with Kedzierski, who admitted suggesting to Trotter early in their discussions that General Cable would support higher prices for paper cable and adhere to the price sheets soon to be issued. On May 24, 1976, Phelps Dodge issued new price sheets, covering quantity discounts, jacket adders, and freight adders, which raised the price of most if not all types of paper cable. Phelps Dodge distributed the new price sheets to its competitors by mail, as was its custom, and they made their way to Penhale's and Kedzierski's desks. Quickly following Phelps Dodge's lead, General Cable simply copied the new prices and issued them as its own effective May 26. Okonite, too, adopted the Phelps Dodge pricing factors, issuing new price sheets for discounts and jacket and freight adders on June 1, 1976.

The issuance of identical price sheets in the highly oligopolistic paper cable industry is not alone sufficient to establish collusive behavior. "Rigid list prices do not prove collusion if transaction prices depart substantially from list." Posner, *Oligopoly and the Antitrust Laws: A Suggested Approach*, 21 Stan.L.Rev. 1562, 1581–82 (1969). But an agreement to stick to newly established price lists does constitute collusive conduct. Traditionally, defendants had used the price sheets only as guides while freely discounting from them to bid competitively. By the time the May 1976 price sheets were issued, however, Trotter, Penhale, and Kedzierski had a clear understanding that their respective companies would cooperate by stabilizing the market price at book. Though wary of each others' true intentions, and concerned that the companies' simultaneous increase not just in book prices but in actual bids would appear concerted, Kedzierski, Penhale, and Trotter nevertheless agreed to adhere to book prices so long as their competitors did. As Penhale put it, Phelps Dodge should "run it up the flag pole and see who salutes." Penhale at 71–72.

Initially, at least, the three fell in line. In June 1976, GK, Phelps Dodge, and Okonite each began quoting book prices from the newly issued price sheets and sticking to them, a drastic change from the rampant discounting that had prevailed for the preceding eighteen months. Because each company bid on book and their price sheets were identical, their bids too were identical. In Penhale's view the identical bids submitted by the three producers during June and July resulted from the discussions held by the three men. Penhale at 103. Furthermore, Roger Brooks, Kedzierski's immediate superior at GK, testified that, based on several conversations with Kedzierski, Brooks understood that Penhale, Kedzierski, and Trotter had agreed that their respective companies would bid at the list prices established in the new price sheets; and Brooks believed that actual bidding during this period manifested this agreement. Brooks at 89–90, 96–97, 102–03, 110–11, 129–33.

Within a few weeks after the price sheets were issued, Kedzierski, Penhale, and Trotter met at the Saddlebrook Marriott to congratulate themselves that the book prices were holding and, in Penhale's words, to "pledge allegiance" to the agreement. In July, Trotter and Penhale met once again at the Saddlebrook Marriott. The three men were also in constant phone contact throughout the summer, discussing general industry conditions as well as specific bids, current pricing, and book price calculations. On several occasions, Kedzierski received an inquiry from pricing officials in corporate headquarters seeking information that would assist in formulating base prices for lead that the corporation would set for its divisions. Though prevailing lead prices were generally announced in the industry journal, Kedzierski contacted Penhale and Trotter to obtain prices actually being quoted in order to maintain a competitive position. Kedzierski passed on the information he received to corporate headquarters, where it formed the basis for lead pricing. Trotter also requested his competitors' lead factors. While lead was a relatively insignificant component of paper cable pricing, these discussions indicate the extent of the three men's efforts to ensure uniformity. Kedzierski at 225–35; Trotter at 380–83.

The agreement had a direct bearing on at least two major bids during the summer of 1976. In preparing a bid to Consolidated Edison involving several million dollars, Penhale and Kedzierski consulted by phone to ensure that each had arrived at identical calculations from the book for the five elements comprising the bid, and then agreed to bid those figures. Kedzierski at 73–76. Subsequently, Penhale informed Kedzierski that he would likely cut the price on one of the five items in order to remain competitive with Phelps Dodge and GK, each of which had a higher performance rating with Con Ed than did Okonite. Trotter and Kedzierski also discussed this bid, Trotter deriving from the conversation a "general feeling" that GK would bid on book. A third round of bilateral discussions on this

bid took place between Penhale and Trotter, after which Trotter predicted that all three companies would bid on book but for Okonite's partial adjustment. His prediction was accurate—the Okonite, Phelps Dodge, and General Cable bids were identical on four of the five items, and Okonite cut on the fifth. Because the bids on four of the items were identical, Con Ed rejected these four and requested rebidding on them. Cowles at 98–99, 134–35, 150; Priesing at 131; Brooks at 99.

The men also cooperated on a pending bid to Commonwealth Edison of Chicago worth more than a million dollars, which each company had bid on book. Commonwealth approached General Cable, suggesting that if it reduced its bid on some minor related items it would receive a major portion of the paper cable business. Sensing that, contrary to Commonwealth's suggestion, the price of these relatively insignificant items would not affect Commonwealth's decision on the paper cable, Trotter and Kedzierski agreed not to cut their companies' bids, despite considerable pressure from GK's field salespeople. Kedzierski at 80–82. Kedzierski also discussed the matter with Penhale, who held a similar view of Commonwealth's strategy and indicated that he too would endeavor to maintain his company's bid prices. Penhale at 163–64. Commonwealth eventually split the order among the three companies, paying the book price to which the three men had agreed to adhere. Penhale at 164.

The existence of an agreement is also demonstrated by the conduct of the three men in confronting one another upon the receipt of field information indicating that a competitor had deviated. At the outset of their arrangement, Penhale and Kedzierski had several phone conversations in which they discussed charges of discounting. Kedzierski at 74. Kedzierski recalled that even at their first meeting there had been some "good-natured kidding" about discounting off the book. Kedzierski at 88. Penhale testified and Kedzierski confirmed that on several occasions Penhale called Kedzierski to "chide" him about having bid off-book, and that Kedzierski routinely

pleaded a mistake in the calculations. Penhale at 154–55. Kedzierski also called Penhale when he received suspicious information from his salespeople. Kedzierski at 59–61. Trotter pointed out variations from book pricing in Okonite bids to Penhale during the same conversations in which the men discussed upcoming orders. Trotter at 104. At some point between late July and early September, but probably during August when it had become apparent that the agreement was breaking down, the three men met again at the Saddlebook Marriott. The major portion of the meeting was taken up by various charges of cheating on one bid or another, Kedzierski and Trotter "berating" Penhale with particular harshness for having cut a price on a significant piece of business with Boston Edison. Kedzierski at 92–93; Penhale at 100–02. When they refused to believe Penhale's initial excuse that a clerk in the district office had made a typographical error, Penhale claimed he was simply retaliating. Penhale at 101, 222–24. The meeting, which proved to be among the last contacts before the market reverted to massive discounting, concluded with extensive discussion of a major bid to the Long Island Lighting Company. Kedzierski at 97–98; Penhale at 102–03, 168.

Phelps Dodge executives characterized Trotter's role in developing the May 1976 price sheets as ministerial. Cowles at 59–61; Priesing at 36–37; *see* Trotter at 95, 152. He was not included in the discussions as to whether or not Phelps Dodge would go back on book, nor asked for recommendations as to appropriate price levels, nor requested to forecast the effect of a price increase on the Phelps Dodge market share. Trotter at 361, 77, 152–53. With respect to the discount schedules, Cowles insisted that upper management determined various marginal income levels, for which Trotter would work up corresponding price schedules. Trotter's superiors would then decide which to adopt without any input from him. Cowles at 205–08. In the case of the freight and jacket adders, Cowles said that Trotter simply pre-

pared price sheets which reflected the costs supplied him by other departments. Cowles at 208–09, 211–12; *see id.* at 58–59.

Trotter performed a significant, corporate staff function, however, in generating the price sheets, as well as compiling and analyzing the pricing, cost, and competitive bidding information which constituted the essential basis for managerial decisionmaking. Cowles at 57–59. He was the only person in the organization capable of doing the mathematical calculations necessary to develop new price sheets. Cowles at 206–12; *see* Priesing at 67. He obtained bid inquiries from field salespeople and relayed prices to them. He testified that his job responsibilities in each of his paper cable positions were "very similar," though the last, that of paper cable product manager, involved "more forecasting." Trotter at 13. With respect to pricing, his responsibility was "to see that [an inquiry] got priced and that the quotes went out on time, to see that bid due dates were met." Trotter at 13–14. If pricing was off-book, Trotter had authority to approve bids up to $25,-000; anything higher had to be approved by Cavanaugh, his immediate superior. During the periods when quotations were from the book, however, Trotter testified that no approval was necessary, though higher management cursorily reviewed the bids. Decisions whether to quote book were made by those in the upper level of management, but Trotter was the source of the competitive data that informed those decisions, and he regularly made pricing recommendations. Trotter at 39–40; 434. When Phelps Dodge began to consider raising prices in early 1976, Trotter was assigned the task of evaluating the continued efficacy of the price book and developing alternative pricing mechanisms. Cowles at 93–94. Phelps Dodge followed his recommendation in retaining the price book, relied on data he generated in making its decisions on new volume discounts, and allowed him to "[use] his own judgment on the freight factors and the jacket adders." Cowles at 96.

Kedzierski also had a major role in paper cable pricing. He joined General Cable as a quotation clerk in 1954, when he learned to use the price book. In 1976 he became paper cable product manager, with autonomous pricing authority for bids up to between $50,000 and $100,000. Kedzierski at 14–16; Brooks at 27. On higher bids he had to consult with Brooks, his marketing manager, and on exceptionally large bids with the general manager, William Garretson. Kedzierski described his pricing responsibilities as "to execute the tactics or strategies or objectives as set by the division, to review the day-to-day work performed by quotation and/or pricing people, and to recommend to management a change in objectives or a change in strategy." Kedzierski at 12–13. "Product managers were responsible for all the pricing strategies development and the day-to-day execution of pricing to include specific quotations and published price sheets." Brooks at 30; *see id.* at 34–35; Jackson at 96–97. The initiative to adjust prices to market conditions was expected to come from the product manager, who would in the first instance develop figures and make a recommendation. Jackson at 75–76. In sum, "the product managers ... really would be the points where the decisions and recommendations would come with respect to pricing," for they were "closest to the marketplace." Brooks at 41.

In addition, Kedzierski kept his immediate superior Brooks apprised of his continuing contacts with Trotter and Penhale and their import, and Brooks did little if anything to discourage them. Trotter and Penhale understood that Kedzierski had signed on to the agreement only after checking with "his management." Trotter at 93; Penhale at 78–79, 142, 166. As marketing manager, Brooks had significant influence in establishing and implementing corporate pricing policy for the products within his market areas. Jackson at 74–75. The position of marketing manager for the Power and Control Division "involved all marketing related responsibilities to include the responsibilities of planning, market analysis, sales analysis ... and also included management of the product man-

agers' functions within the division." Brooks at 22–23. Brooks viewed his responsibilities with respect to paper cable pricing to entail "managing the entire function and ensuring that basically the pricing that was executed on a day-to-day basis was within what is called acceptable or market competitive pricing ranges." Brooks at 27–28. Brooks and Kedzierski worked together closely, sometimes meeting as often as ten to fifteen times a day. Upon first hearing from Penhale, Brooks testified, Kedzierski called him in Miami to consult. Brooks at 89. Thereafter, Kedzierski kept Brooks aware that the contacts were continuing, made it "clear" that he was talking on the phone with Penhale, and advised Brooks that the meetings were intended to clarify the companies' intention to adhere to published book prices. Brooks at 89–93, 96–98. Brooks admitted that the result of the series of meetings and phone calls was an agreement to quote book price on the major jobs under bid at the time in order to "stabilize" the paper cable market. Brooks at 102–03, 111, 132.

Phelps Dodge contends that it increased prices, and GK says it followed the increase, solely because of economic necessity, and not as a result of any agreements reached by their employees. Conditions had become so bad, they allege, that a bold attempt to bolster prices became worth trying, despite continuing, abysmal demand. Schell at 97–98; Cowles at 26; *see* Penhale at 30; Viggiano at 61. Cowles claimed that the Phelps Dodge strategy was in effect riskless:

> Frankly, [with] the incremental income we were obtaining at that time, it really did not make much difference whether we took any more business at those prices or we just reduced our work force and curtailed our activities....

Cowles at 32. Cowles testified that he, Schell, and Priesing determined to increase book prices and stay with them for at least an initial period, suffering some loss of business in an attempt to make the new prices stick. Cowles at 48–50, 59; *see* Priesing at 35, 131. If the competition did not follow but instead sought to take ad-

vantage of the move by undercutting the new, higher bids, Phelps Dodge would reconsider. Priesing at 131. At least initially, General Cable was happy to follow, as had been its custom. Brooks at 88–89.

These arguments fail to disprove, however, that the companies relied upon and benefitted from the collusion of Trotter, Penhale, and Kedzierski. They demonstrate that defendants greatly needed to return to book pricing, but the risks of any single company doing so without the others were very substantial: at the time of Phelps Dodge's decision, only three anticipated bids comprised the major portion of the industry's projected requirements for 1977 and early 1978. Cowles at 49. Just a few months before the increase, General Cable had decided not to pursue a similar strategy, after weighing the likelihood that the competition would follow its lead against the severe consequences if its strategy failed. Brooks at 74–76. The risks associated with a unilateral price increase diminished as the likelihood grew that competitors would follow, and that likelihood was made significantly greater by the activities of Trotter, Penhale, and Kedzierski, which undoubtedly affected the decision-making process. Furthermore, the conspiratorial activities helped keep the increase alive because the three men were able to signal each other their companies' willingness to continue on book, as well as to police each other's adherence to book.

## II. *Liability of Phelps Dodge and GK.*

The Order provides the rule of law in this case. *See FTC v. Lukens Steel Co.,* 454 F.Supp. 1182, 1188 (D.D.C.1978). It prohibits the respondent corporations "from doing and performing, by agreement, combination or conspiracy" any of the acts enumerated by its decretal paragraphs. Order at 2. The government seeks to impose liability here under three specific paragraphs: the first, which proscribes "fixing, mantaining or enhancing" prices and other charges, terms, and conditions of sale; the second, which prohibits "providing that any price lists ... be adopted and adhered to;"

and the third, which prohibits the monitoring and enforcement of such price levels.

■ The evidence on submission warrants a finding that Kedzierski and Trotter agreed to fix prices. In the paper cable industry, proof of a price-fixing agreement has to be particularly strong because the concededly lawful use of the price books by all three competitors made identical, on-book pricing less suspicious than identical prices would be in an industry that had no price book. Here, however, the government has demonstrated that Kedzierski, Trotter, and Penhale expressly agreed that their companies would bid identically at book and would maintain those prices. Their conduct violated the first paragraph of the 1936 Order, which proscribed price-fixing in general terms, and the second, which specifically prohibited price-fixing in the form of an agreement to adhere to book prices. In addition, they monitored and encouraged compliance with the agreement to adhere to book prices. Their efforts may not have risen to the level of "participating with competitors in initiating or conducting any *investigation* for the purpose of ascertaining and reporting for their joint benefit if, when and to what extent any competitor has deviated from any price list or any announced or quoted price." Order ¶ 4 (emphasis added); *see In re National Electrical Manufacturers Association,* Findings as to the Facts and Conclusion (Dec. 29, 1936), ¶ 4(e), at 5. But their conduct violated the Order's fourth paragraph prohibiting "otherwise bringing pressure or *persuasion* to bear upon competitors not to deviate from any such price list or price." Order ¶ 4 (emphasis added). The questioning, "chiding," "good-natured kidding," expressions of "slight disappointment," and the like comprised forms of persuasion, designed to accomplish the prohibited ends.

■ GK suggests that the facts in this case fall outside the specific provisions of the 1936 Order, relying on what it terms the " 'four corners' rule of strict construction" applicable in proceedings to enforce consent decrees. *See, e.g., United States v. ITT Continental Baking Co.,* 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975); *United States v. Armour Co.,* 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). It contends, first, that conditions in the modern paper cable industry have radically changed from those existing at the time of the Order, and second, that the decretal provisions of the Order were directed primarily at activities undertaken through the respondents' trade association. The four-corners rule prohibits "modification [of consent decrees] disguised as construction." *ITT Continental,* 420 U.S. at 236 n. 9, 95 S.Ct. at 934 n. 9. Contrary to GK's suggestion, however, the rule does not necessarily mandate strict construction; it simply shifts the court's focus from the purpose of the statute to that of the order. *See United States v. Ancorp National Services, Inc.,* 516 F.2d 198, 201–02 (2d Cir.1975); *United States v. Olin Ski Co.,* 503 F.Supp. 141, 143 (S.D.N.Y.1980) (quoting *United States v. J.B. Williams Co.,* 498 F.2d 414, 431 (2d Cir.1974)). The purpose of the Order under consideration here was to prohibit price-fixing by means of the price book or any other device, and the conduct proven falls squarely within the Order's central prohibitions. The first paragraph contains no more than "anti-price fixing boilerplate language," Cambria Affidavit ¶ 11; *see* GK Memorandum in Opposition to Motion for Summary Judgment on Liability at 19 n. *, but it amply covers the subject of this action—a garden-variety price-fixing conspiracy, replete with surreptitious phone calls, anonymous transmissions through the mail, and meetings in hotel cocktail lounges. The purview of the second paragraph specifically includes agreements between the respondent corporations to adhere to any price lists, whether "acting directly or by or through the respondent, National Electrical Manufacturers Association." Order at 2. Finally, GK fails to explain how the significantly smaller number of competitors, the ailing state of the industry, or any other changed circumstance would render any portion of the Order ineffective absent a modification,

which neither GK nor Phelps Dodge had sought.

### A. *Inference of Conspiracy*

Phelps Dodge and GK seek to avoid liability for civil penalties by arguing that the relevant bids resulted wholly from independent business decisions into which Kedzierski and Trotter had no input. The structure of the Order provides some support for defendants' argument, as the prefatory paragraph does not prohibit agreements to do the things specified in the enumerated paragraphs but instead proscribes defendants from "doing and performing" those things pursuant to an agreement. *See FTC v. Cement Institute,* 333 U.S. 683, 728, 68 S.Ct. 793, 816, 92 L.Ed. 1010 (1948). In effect, Phelps Dodge and GK argue that, even if Kedzierski, Trotter, and Penhale agreed to adhere to book price, the companies submitted identical, book-price bids for independent reasons, not because their employees had so agreed.

The weight of the evidence, however, supports an inference that GK and Phelps Dodge violated the Order by fixing prices pursuant to the agreement between Penhale, Kedzierski, and Trotter. The evidence shows that there was an agreement to fix the prices quoted in several large bids, that the companies bid identically on those orders, that the fixed bids reflected significantly higher prices than had prevailed in the market for some time, and that the higher prices proved a temporary aberration.

In the absence of direct evidence, a court may rely on circumstantial evidence of consciously parallel corporate conduct to support an inference of unlawful agreement. *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 142, 68 S.Ct. 915, 922, 92 L.Ed. 1260 (1948); *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 221, 59 S.Ct. 467, 472, 83 L.Ed. 610 (1939). "The agreement need not be proven by direct evidence; conduct pointing to concerted action is sufficient." *Phelps Dodge Refining Corp. v. Federal Trade Comm'n,* 139 F.2d 393, 396 (2d Cir.1943). Standing alone, however, such evidence is insufficient "unless the circumstances under which it occurred make the inference of a rational, independent choice less attractive than that of concerted action." *Ambook Enterprises v. Time, Inc.,* 612 F.2d 604, 615 (2d Cir.1979) (Friendly, J.) (quoting *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 446 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978)), *cert. dism.* 448 U.S. 914, 101 S.Ct. 35, 65 L.Ed.2d 1179 (1980); *accord First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 286–88, 88 S.Ct. 1575, 1591–92, 20 L.Ed.2d 569 (1968); *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 540–41, 74 S.Ct. 257, 259–60, 98 L.Ed. 273 (1954); *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.,* 513 F.2d 102, 110–11 (2d Cir. 1975); *Federal Prescription Service, Inc. v. American Pharmaceutical Association,* 663 F.2d 253, 267 (D.C.Cir.), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1981). The principal considerations identified by the courts in making this inquiry are, first, whether the companies undertaking the parallel conduct had motivation to enter an agreement, *see Cities Service,* 391 U.S. at 286–87, 88 S.Ct. at 1591–92; *Ambook,* 612 F.2d at 615–16, and second, whether the parallel decisions would have been contrary to the companies' individual economic interests if effected separately, *see Modern Home Institute,* 513 F.2d at 110–11; II P. Areeda & D. Turner, *Antitrust Law* ¶ 317 at 82 (1978). *See also Bogosian,* 561 F.2d at 446; *Venzie Corp. v. United States Mineral Products, Co.,* 521 F.2d 1309, 1314 (3d Cir.1975); *Lukens,* 454 F.Supp. at 1190.

The first factor is easily found here: the record is replete with evidence that the paper cable industry regarded a rise in prices as essential for the survival of the line of business involved. Both Phelps Dodge and GK had strong motivation to enter an agreement to support artificially high prices. Defendants contend, however, that separate implementation of parallel decisions to raise prices was reasonable to

expect in the industry, since pricing had become so "animalistic" at the time that loss of business was actually a blessing, averting a decision to leave the market altogether because of losses that would have been sustained in filing the orders. This argument is unconvincing. While Anaconda in 1975 and GK in 1978 found long-term prospects so bleak that they left the industry, no evidence exists that any of the firms unilaterally turned down business either immediately before or immediately after the conspiracy. Instead, competitive pressures were so strong during the conspiracy that widespread cheating appeared almost at once. The evidence shows in addition that those at Phelps Dodge who determined to raise prices knew that they could only maintain those prices if the competition followed. The continuing quest for new orders accords with familiar economic wisdom: absent a decision to cease operations completely, a company needs business to minimize loss, and the incentives to collude will be at least as strong in a declining as in any other market. *Compare* Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal,* 75 Harv.L.Rev. 655, 670 (1962), *with* Posner, *Oligopoly and the Antitrust Laws: A Suggested Approach,* 21 Stan.L.Rev. 1562, 1592 (1969). The testimony of GK and Phelps Dodge managers indicates they did not abjure new orders, but simply calculated that the risks involved in raising prices were reasonable in light of the potential benefits for increased profits should their competitors follow.

Economic theory suggests that, in a market of few sellers and a fungible product, market intelligence and ability to respond will be so high as to make it difficult for one to differentiate between collusion and interdependent decisionmaking. L. Sullivan, *Handbook of the Law of Antitrust* § 111, at 320–21 (1977). *See generally* H. Blake & R. Pitofsky, *Cases and Materials in Antitrust Law* 1023 (1967); L. Schwartz & J. Flynn, *Antitrust and Regulatory Alternatives* 503–507 (1977). Professor Turner has argued that interdependent, consciously parallel oligopoly pricing is in reality individual decisionmaking and should be treated as such. He suggests that in an oligopolistic market with relatively inelastic demand, a price cut will likely not result in greater market share for the price cutter. Instead, he insists, competitors might be expected to match the price, and the net effect will be to reinstitute the prior allocation at a lower price. The interdependence that necessarily results from the structure of oligopoly markets might constitute agreement, but Turner believes it should not be characterized as collusion, since "mere interdependence of basic price decisions is not conspiracy." 75 Harv.L.Rev. at 672. Thus, the structure of the paper cable industry in 1976 may weaken the significance of evidence of conscious parallelism as indicative of an unlawful agreement. *See id.* at 665–66; L. Sullivan, §§ 116–17; *Ambook,* 612 F.2d at 615; *Delaware Valley Marine Supply Co. v. American Tobacco Co.,* 297 F.2d 199, 203 (3d Cir.1961), *cert. denied,* 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962).

Others have reasonably suggested, however, that it is unlikely that "prices could long be maintained above cost in a market, even a highly oligopolistic one, without *some* explicit acts of communication and implementation." Posner, 21 Stan.L.Rev. at 1574. Turner himself concedes that "[i]t may well be that in reality a stable and firm pattern of noncompetitive prices is rarely achieved without some kind of agreement." 75 Harv.L.Rev. at 662. Nevertheless, whatever the theoretic possibility of an effective though wholly tacit oligopoly price agreement, or the legal significance of such behavior, certain marketplace data provide sufficient evidence of actual collusion in this case. For example, all producers in the paper cable market had excess capacity during the period immediately prior to the conspiracy, Jackson at 58–59; Kedzierski at 104–05; Trotter at 157–58; Cowles at 36–37; Viggiano at 117–19; Penhale at 178, yet the price sheets issued in late May and early June and the bids based upon them reflected significant-

ly higher prices than the companies had been charging, Trotter at 363–65; Brooks at 47; Viggiano at 62; Priesing at 130; Government Response to Defendants' Opposition to Motion for Partial Summary Judgment, Exhibit I. A precipitous rise in prices in the face of such excess capacity and declining demand becomes highly suspicious, *see* Turner, 75 Harv.L.Rev. at 659, as does a refusal to cut prices under the same circumstances, *see* Posner, 21 Stan.L. Rev. at 1582–83. Equally suspicious are identical, supposedly secret bids from producers with excess capacity vying for a large order, *see id.* at 1582; Turner, 75 Harv.L.Rev. at 659, notwithstanding the readily available mechanism of the price book. All these telltale signs are present here.

Moreover, in this case the circumstantial evidence of marketplace conditions and behavior does not stand alone. Apart from its significance as a matter of the vicarious liability of the corporations for the unlawful activity of their employees, the evidence of contacts between Kedzierski, Trotter, and Penhale strengthens the inference that the corporations' actions resulted from collusion rather than interdependent decision-making. First, it is reasonable to conclude, and this court does conclude, that officials in Phelps Dodge and GK responsible for setting corporate pricing policy and determining actual prices on the Con Ed and Commonwealth Edison bids either directly or indirectly received from the conspirators assurances in some form that their competitors would support price increases. Brooks' continuing awareness of his immediate subordinate's activities at GK makes the inference of such assurances particularly strong. Kedzierski testified that Brooks led him to understand that he was keeping higher management informed, specifically mentioning Garretson, and that Brooks made clear at the same time that he couldn't acknowledge securing the information in the first place. Kedzierski at 120, 197. The ritual and identical Garretson and Cummings Affidavits denying any such knowledge do not defeat the inference drawn from the circumstantial economic evidence and the direct evidence of agreement.

Even if the respective higher managements were not expressly aware of their employees' agreement, their reliance on the field information and market assessments generated by Trotter and Kedzierski as paper cable managers infected the pricing decisions with the taint of the conspiracy. Finally, Trotter and Kedzierski each had a major role in developing the figures incorporated into the price sheets adopted by their respective employers in May and June 1976. Reliance of upper management on these price lists constituted action pursuant to an agreement by the companies to violate the Order.

## B. *Vicarious Liability*

Defendants are also liable in this case because they are responsible for the conduct of Kedzierski and Trotter. Little direct authority exists on the issue of the vicarious liability of a corporation for its employees' conduct in violation of a cease-and-desist order. The parties argue over whether to employ a theory of apparent authority, proof of actual authority, or some other test based on an agency rationale. Whether Kedzierski and Trotter had "actual" authority, however, or appeared to have authority, to bind their respective employers to the price-fixing conspiracy is not the proper inquiry here. One decision that relied on agency reasoning supports the view that "if defendants' salesmen and representatives were acting within the *apparent* scope of their authority when the alleged representations took place, then liability is imposed upon the defendant." *United States v. Tri-State Home Improvement Co.*, 446 F.Supp. 14, 16 (E.D.Wis. 1977) (emphasis in original). Even that decision specifically and properly rejected in the context of a cease-and-desist order the corollary that the third person relying on the agent's apparent authority must reasonably believe that the agent is authorized. *See* Restatement (Second) Agency § 8, comment c. The court explained:

The defendants' view that it is necessary to establish that the customers actually believed that Podell was authorized to bind Tri-State is not a correct statement of the law in actions to enforce cease and desist orders of the FTC. This is not a case where the third party is suing the principal under a theory of apparent authority. The central inquiry here is whether or not the defendants violated a cease and desist order of the FTC. That order forbids the defendants from making various representations. it is sufficient for a motion for partial summary judgment to show that Tri-State clothed its sales representatives with manifestations of its authority, and this has been done by the depositions referred to above. Whether or not customers believed Podell to be so authorized is irrelevant to the inquiry of whether or not the FTC order was violated.

446 F.Supp. at 16.

 The apparent-authority theory is inapposite, however, to the problem of evaluating a company's vicarious liability for conduct by its employees that violates cease-and-desist orders. Whatever terminology the cases employ, the true import of their holdings is that when a corporation grants authority to its agents or employees to make sales on its behalf, it cannot then eschew responsibility for the means adopted by the agents and employees to make those sales, even when it has made real efforts to control their conduct. *See Standard Distributors v. FTC*, 211 F.2d 7, 13 (2d Cir.1954); *Parke, Austin & Lipscomb, Inc. v. FTC*, 142 F.2d 437, 440 (2d Cir.1944); *Globe Readers Service, Inc. v. FTC*, 285 F.2d 692, 695 (7th Cir.1961); *Steelco Stainless Steel, Inc. v. FTC*, 187 F.2d 693, 697 (7th Cir.1951); *International Art Co. v. FTC*, 109 F.2d 393, 396 (7th Cir.1940); *Perma-Maid Co. v. FTC*, 121 F.2d 282, 284 (6th Cir.1941); *see also* W. Seavey, *Studies in Agency* 187 (1st ed. 1949) (where agent has authority to sell goods, he may have "authority" to make certain representations even though forbidden to do so, but doubtful whether this is "apparent authority"). The proper inquiry is not into a third party's reasonable perception of the agent's or employee's authority, but into the corporation's delegation of responsibility to employees to carry out activities within the purview of a cease-and-desist order. In interpreting a regulatory statute, common-law definitions are irrelevant; instead authority must be construed to extend accountability as far as necessary to eradicate the unfair practices which underlie the order. *See Goodman v. FTC*, 244 F.2d 584, 591 (9th Cir.1957).

Nor is it necessary to rely upon the Supreme Court's endorsement of apparent-authority theory in the context of civil antitrust liability in *American Society of Mechanical Engineers v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). The harm addressed here did not flow from any misapprehension of authority, and those defrauded were not persons dealing with participants in the conspiracy, but the customers of the conspirators' employers. The customers might reasonably have relied on the integrity of the bids, but their reliance has no relevance to the capacity of Kedzierski and Trotter to involve their employers in the conspiracy. *Compare Wilk v. American Medical Association*, 719 F.2d 207, 231 (7th Cir.1983) (private damages suit; refusal to deal); *Pan Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 561 (5th Cir.1980) (same); *United States v. Empire Gas Corp.*, 537 F.2d 296, 301–02 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977) (civil antitrust action; attempt to monopolize through threats of retaliatory price cuts).

The two courts that have alluded to apparent authority in the context of a price-fixing conspiracy reached conclusions similar to the one here espoused. In *Continental Baking Co. v. United States*, 281 F.2d 137, 149–51 (6th Cir.1960), an appeal from the conviction under section one of the Sherman Act of three baking companies for a conspiracy to fix prices, the court questioned the utility of apparent authority terminology, and rested instead on the settled principle that "so long as the criminal

act is directly related to the performance of the duties which the officer or agent has the broad authority to perform, the corporate principal is liable for the criminal act also, and must be deemed to have 'authorized' the criminal act." And in *United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 204–05 (3rd Cir.1970), *cert. denied*, 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 (1971), which affirmed the conviction of a corporation under section one of the Sherman Act on the basis of a sales manager's participation in a price-fixing conspiracy, the court approved a jury instruction that had "charged in substance that the corporation would be responsible if the agent acted 'on behalf of the corporation and within the scope of his employment or his apparent authority.'" The instruction defined acts within the scope of employment as "acts done on behalf of a corporation and directly related to the performance of the type of duties the employee has general authority to perform."

■ The standard for imputing liability to a corporation for the acts of its employees should be no more stringent in civil penalty proceedings than in criminal prosecutions, where courts generally require only that the illegal act be committed within the scope of the wrongdoer's employment and refuse to allow technical claims of lack of authority or even evidence that the employee acted against express instructions to defeat the corporation's responsibility. *See Developments in the Law— Corporate Crime: Regulating Corporate Behavior Through Criminal Sanctions*, 92 Harv.L.Rev. 1227, 1247–51 & n. 32 (1979). In *United States v. Koppers Co.*, 652 F.2d 290, 298 (2d Cir.1981), an appeal by a corporation from a felony conviction under section one of the Sherman Act, the court specifically approved an instruction by which

> [t]he [district] court charged that a corporation could be held criminally liable for the acts of its managerial agents "done on behalf of and to the benefit of the corporation and directly related

to the performance of the duties the employee has authority to perform ... By a managerial agent I mean an officer of the corporation or an agent of the corporation having duties of such responsibility that his conduct may fairly be assumed to represent the corporation."

*See also United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1007 (9th Cir.1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973) ("as a general rule a corporation is liable under the Sherman Act for the acts of its agents in the scope of their employment, even though contrary to general corporate policy and express instructions to the agent"); *Continental Baking Co.*, 281 F.2d at 149.

■ No reason exists to impose a standard less strict in civil penalty proceedings than in criminal prosecutions, because civil penalties differ from the criminal sanctions provided for in antitrust statutes. The civil penalty is not designed to punish or to assign moral culpability, but to deter. *Compare United States v. United States Gypsum Co.*, 438 U.S. 422, 437–43, 98 S.Ct. 2864, 2873–77, 57 L.Ed.2d 854 (1978), *with J.B. Williams*, 498 F.2d at 421. For this reason, "the standard of responsibility for compliance and of liability for transgression is drawn to securing abatement of the practices and not to testing (except in fixing the amount of penalty) for the presence of corrupt complicity." *United States v. Halperin*, 1966 Trade Cases ¶ 71,905 at 83,176 (E.D.N.Y.1966). The scope of liability, like the breadth of the penalty provisions, must "provide a meaningful deterrence against violations." *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 232, 95 S.Ct. 926, 932, 43 L.Ed.2d 148 (1975) (considering "continuing failure or neglect to obey" provision of section 5(*l* )).

■ The goal of deterrence is best effectuated by a rule which holds the corporation strictly accountable for the conduct of its employees acting within the scope of their responsibilities. To achieve the most effective deterrence, the entity against which an order is directed must bear a high

degree of responsibility for ensuring its employees' adherence to the order's requirements. Any less stringent standard would undermine the effectiveness of FTC orders. In civil penalty proceedings, as in criminal prosecutions, a corporation "which employs an agent in a responsible position cannot say that the man was only 'authorized' to act legally." *Continental Baking,* 281 F.2d at 150; *see also Hydrolevel,* 456 U.S. at 572–73, 102 S.Ct. at 1945–46. Even though its influence may be indirect, the corporation is still in the best position to regulate the conduct of its middle and lower management employees. The pressure to maximize income is keenly felt below senior levels and may lead to "unauthorized" antitrust violations. *See* Coffee, *"No Soul to Damn: No Body to Kick": An Unscandalized Inquiry Into The Problem of Corporate Punishment,* 79 Mich.L.Rev. 386, 397–400 (1981); *see also* Coffee, *Beyond the Shut-Eyed Sentry: Toward a Theoretical View of Corporate Misconduct and an Effective Legal Response,* 63 Va.L.Rev. 1099, 1132–47 (1977). But "to deny the possibility of corporate responsibility for the acts of minor employees is to immunize the offender who really benefits, and open wide the door for evasion." *United States v. George F. Fish, Inc.,* 154 F.2d 798, 801 (2d Cir.1946), *cert. denied,* 328 U.S. 869, 66 S.Ct. 1377, 90 L.Ed. 1639 (1946); *see Hilton Hotels,* 467 F.2d at 1006. Particularly where the end sought is deterrence, "distinctions ... between officers and agents, or between persons holding positions involving varying degrees of responsibility," are inappropriate. *George F. Fish, Inc.,* 154 F.2d at 801.

■ Both Kedzierski and Trotter held the title of paper cable product manager, and each had " 'duties of such responsibility that his conduct may fairly be assumed to represent the corporation.' " *Koppers,* 652 F.2d at 298 (quoting district court charge); *see* Model Penal Code §§ 1.04(5), 2.07(1)(a) (where offense is "violation" involving only civil penalties or contemplates conduct, like price fixing, generally involving corporate action, corporation may be held liable if "the conduct is performed by an agent of the corporation acting in behalf of the corporation within the scope of his office or employment"); *id.* § 2.07, Comment at 150 (Tentative Draft No. 4, 1955); *Developments,* 92 Harv.L.Rev. at 1251–52; *cf. United States v. Johnson,* 541 F.2d 710, 711–12 (8th Cir.1976) (appropriate to hold president and sole stockholder of corporation individually liable for civil penalties by virtue of corporation's salespeople's violations of cease-and-desist order). One might fairly state, therefore, that since the corporation subject to a cease-and-desist order has a duty to secure compliance with its provisions, penalties for noncompliance are imposed not as a matter of vicarious liability, nor of apparent authority, nor of respondeat superior, but instead simply for failure to achieve compliance by persons in positions of relevant responsibility. The employer must "stand or fall with those whom he selects to act for him. He is in the same plight, if they are delinquent, as if he had failed to abate a nuisance on his land.... It is the case of the non-performance of a nondelegable duty." *People v. Sheffield Farms-Slawson-Decker Co.,* 225 N.Y. 25, 30, 121 N.E. 474, 476 (1918) (Cardozo, C.J.) (citations omitted), *quoted in Continental Baking,* 281 F.2d at 150; *United States v. Armour & Co.,* 168 F.2d 342, 343–44 (3d Cir.1948).

■ Finally, defendants' contention that Kedzierski and Trotter entered the conspiracy in order to curry favor with Penhale in hopes that he might be able to offer them employment in the future, rather than to benefit their companies, is of no consequence here. To convict a corporation of a crime on the basis of its agent's conduct, the agent must have acted with an intention to benefit the corporation. *E.g., Hilton Hotels,* 467 F.2d at 1006 n. 4; *Standard Oil Co. v. United States,* 307 F.2d 120, 128–29 (5th Cir.1962); *see Developments,* 92 Harv.L.Rev. at 1250. But this general rule arises directly from the requirement of criminal intent: "unfaithful servants whose conduct was undertaken to advance the interests of parties other than their corporate employer" cannot have the

requisite intent to impute to the corporation. *Standard Oil,* 307 F.2d at 129. Liability for civil penalties, on the other hand, accrues without regard to the actor's intent; the government need only prove that the Order has in fact been violated. *E.g.,* *United States v. H.M. Prince Textiles, Inc.,* 262 F.Supp. 383, 388 (S.D.N.Y.1966); *United States v. Vitasafe Corp.,* 212 F.Supp. 397, 398 (S.D.N.Y.1962). The *Hydrolevel* Court explicitly rejected the agent's lack of intent to benefit the corporation as a defense in actions to recover treble damages, regarding it as "simply irrelevant" to the deterrent purposes of the antitrust laws. 456 U.S. at 573–74, 102 S.Ct. at 1946–47.

Even were the defense available, it would not exculpate Phelps Dodge or GK here. The record is devoid of support for the contention that Kedzierski acted from job insecurity. No evidence exists that his superiors were dissatisfied with his performance or that he was dissatisfied with his job. The only evidence that he perceived a need to explore other opportunities was his testimony that when the sale of GK's paper cable division to another company became imminent, he initiated a conversation with a former GK employee then employed at Okonite about employment prospects there. Kedzierski at 117–18. But this conversation did not occur until 1978. At the time of the events under consideration here, Kedzierski had worked for GK for over twenty-two years and had a history of steady if unspectacular promotion. That pattern continued when Kedzierski was promoted to marketing manager in early 1977, a position he retained upon the sale of the division to Pirelli. Kedzierski at 8, 16–17.

Trotter may well have believed his job insecure. Trotter at 128; Flood at 70; Kedzierski at 262; Penhale at 181, 225. He testified that sometime before 1976 he had lunch with Penhale and Larry Miscall, a former Phelps Dodge employee then with Okonite, after Miscall called him and intimated that Okonite might be looking for new employees. Trotter at 265–66, 273–74. he testified also that when he learned in

October 1975 that his job was in jeopardy, he contacted Penhale again, presumably to test the waters. Trotter at 279; *see* Penhale at 181, 225; Flood at 70; Yearly at 68–69. But the evidence does not support Phelps Dodge's contention that Trotter was willingly manipulated by Penhale, leaking information to him in the hope that he would take care of him should he lose his job at Phelps Dodge. Cowles testified that when he got an inkling that Trotter might improperly be receiving information about competitors, he assured him that regardless what happened to the paper cable business he would have a job. Cowles at 68. By these assurances Cowles implicitly recognized what other evidence makes clear— that Trotter saw his employment security inextricably entwined with the future of the paper cable industry. *See* Kedzierski at 262; Priesing at 121. Trotter was acting for his own purposes to the extent that he would benefit from a revival of the fortunes of the Phelps Dodge paper cable business. But behavior induced by this type of pressure, though prohibited by company policy as well as by law, is intended to benefit both the corporation and the individual involved. *See* Cowles at 95; *American Radiator,* 433 F.2d at 204. *Compare Hilton Hotels,* 467 F.2d at 1006 n. 4 ("purpose to benefit the corporation is necessary to bring the agent's acts within the scope of his employment") *with id.* at 1003 n. 1 (no defense that boycott resulted from employee's personal quarrel with representative of boycotted company).

### III. *Civil Penalty.*

#### A. *Continuing Violation.*

■ Section 5(*l*) of the Federal Trade Commission Act provides for civil penalties of up to $10,000 for each violation against individuals or entities who violate final orders of the Commission. In the case of a violation through "continuing failure to obey or neglect to obey a final order of the Commission," each day that the conduct continues is a discrete offense subject to the maximum penalty. A "continuing conspiracy to fix prices" is the type of behav-

ior Congress intended to cover as a "continuing failure or neglect to obey." *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 231, 95 S.Ct. 926, 932, 43 L.Ed.2d 148 (1975). In *ITT Continental,* the Supreme Court observed:

These violations share two discernible characteristics: the detrimental effect to the public and the advantage to the violator continue and increase over a period of time, and the violator could eliminate the effects of the violation if it were motivated to do so, after it had begun.

*Id.* Effective deterrence requires daily penalties for this type of violation, for without them potential violators might regard the statutory penalty "as nothing more than an acceptable cost of violation." *Id.*

▮ GK contends that "[w]hile the Supreme Court ... acknowledged, in dictum, the possibility that an *ongoing* conspiracy may constitute a continuing failure or neglect to obey a final FTC order, the Court's dictum hardly suggests that every agreement or 'conspiracy,' even if proved, amounts to a continuing violation." Memorandum of GK on Issue of Civil Penalty at 26. GK concludes that here the proof of the requisite "discrete continuing violations" necessary to establish an ongoing conspiracy is lacking. *Id.* at 28. To the contrary, a conspiracy to maintain prices at an artificially inflated level is by its very nature an ongoing enterprise. As the court in *FTC v. Consolidated Foods Corp.,* 396 F.Supp. 1353, 1356 (S.D.N.Y.1975), upon which GK relies, pointed out, "continuing conspiracies to fix prices ... necessarily continue on a day-to-day basis until a specific act is taken in abatement." The very phrasing chosen by GK to make the argument—"discrete continuing violation" —confuses acts attributable to the conspiracy with the conspiracy itself. The discrete acts taken by the participants are simply evidence of the underlying conspiracy; they do not reflect the full extent of the wrong effected by the conspiracy itself. The approach suggested by GK would impose only the "license fee" which Congress moved to foreclose. *See ITT Continental,* 420 U.S. at 231, 95 S.Ct. at 932; H.Rep. No.

580, 86 Cong., 1st Sess., *reprinted in* 1959 U.S.Code Cong. & Ad.News 1804, 1807 (discussing amended section 5(*l*) as model for similar amendment to section 11 of Clayton Act); *see also United States v. Beatrice Foods Co.,* 351 F.Supp. 969, 971 (D.Minn. 1972), *aff'd,* 493 F.2d 1259 (8th Cir.1974), *cert. denied,* 420 U.S. 961, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975).

▮ GK also contends that a violation is continuing for purposes of assessing daily penalties only if its effects are continuing. The argument miscomprehends the Court's statement in *ITT Continental* that Congress intended the continuing violation provision "to assure that the penalty provisions would provide a meaningful deterrence against violations whose *effect* is continuing and whose detrimental *effect* could be terminated or minimized by the violator at some time after initiating the violation." 420 U.S. at 232, 95 S.Ct. at 932 (emphasis in original). As is obvious from the context, however, this language did not qualify the definition of continuing violation, but rather expressed the deterrent rationale underlying the daily penalty provision. Proof of specific, continuing effects of a violation is unnecessary if a conspiracy has been proved to have commenced and has not been shown to have ended.

▮ Phelps Dodge employs a similar strategy by reading *ITT Continental* to treat as continuing violations only conduct of which the defendant was aware and which it could have stopped had it wished. The observation that one characteristic of a continuing violation was the ability of the violator to "eliminate the effects of the violation if it were motivated to do so," 420 U.S. at 231, 95 S.Ct. at 932, does not qualify the definition of "continuing violation," but simply explicates its deterrent purpose. Phelps Dodge's argument that only "deliberate and calculated flouting" of the Order would implicate the continuing violation provision is a transparent attempt to reargue the issues of corporate responsibility and bad faith under a different rubric.

The number of offenses remains to be counted. The imprecision of the deponents' testimony makes it difficult to pin down the duration of the conspiracy here, but it lasted at least from the time of the issuance of the new price sheets at the end of May until the final tripartite meeting in August. Two meetings occurred during April or May, and the conspirators had extensive phone contact during those months. Brooks' testimony makes clear that the agreement was in place by the time Kedzierski met with Penhale, which occurred no later than May 24, 1976. *See* Brooks at 90, 96, 101–02, 111.

Neither Phelps Dodge nor GK has satisfied its burden of advancing evidence to show when the conspiracy ended. *See United States v. James*, 609 F.2d 36, 41 (2d Cir.1979), *cert. denied*, 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980); *United States v. Molina*, 581 F.2d 56, 59 (2d Cir. 1978); *United States v. Stromberg*, 268 F.2d 256, 263 (2d Cir.1959). Trotter testified that at their meeting in August each of the three men indicated that his company would be bidding on book to Long Island Lighting. Trotter at 120–21, 188. Kedzierski recalled only that they discussed whether they would be bidding on that order, and Penhale was not certain whether the Long Island Lighting discussion had occurred at this meeting or by phone. Kedzierski at 95; Penhale at 150–51. Other discussion at the August meeting had made clear to all that their agreement was evaporating, so they would not likely have assumed that their competitors' bids would be on book absent explicit confirmation. Trotter testified that the men also discussed the Con Ed rebid at this meeting, each indicating that his company would remain on book. Trotter at 119–20. Neither Penhale nor Kedzierski mentioned discussing the rebid at this meeting, however, and Penhale assumed that the companies had gone off book on the rebid. Penhale at 147; *see* Cowles at 150. The record demonstrates, moreover, that the agreement collapsed after the August meeting. Kedzierski testified he had no significant conversations with Penhale after that meeting, and but one or two with

Trotter, who Phelps Dodge had by that time transferred to another division upon learning that he had had improper contacts with competitors. Kedzierski at 96–97. Penhale and Kedzierski testified that they knew by the time they left the August meeting that the agreement was dead, an assessment Kedzierski shared with Brooks. Penhale at 102; Kedzierski at 97. This meeting constituted the last attempt of the conspirators to maintain their arrangement so it is appropriate to use it as the termination date; and since the weight of the testimony places this meeting in August, Trotter at 116, 118–19, 376; Kedzierski at 89; Penhale at 95–96, a termination date of August 1, 1976, seems a fair and realistic estimate. By this time, too, the resumption of competitive activity in the marketplace demonstrated that the conspiracy had disintegrated. *See United States v. Continental Group, Inc.*, 603 F.2d 444, 467 (3d Cir.1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). The agreement is thus held to have lasted sixty-nine days.

### B. *Amount of Civil Penalty.*

 Determining the appropriate civil penalty is a matter within the sound discretion of the trial court. *ITT Continental*, 420 U.S. at 229 n. 6, 95 S.Ct. at 931 n. 6; *Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115, 1121 & n. 8 (2d Cir.1975), *cert. denied*, 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *United States v. J.B. Williams Co.*, 498 F.2d 414, 438 (2d Cir.1974), *aff'g in part and rev'g in part*, 354 F.Supp. 521 (S.D.N.Y.1973). The courts have identified several factors to guide this discretion: the good or bad faith of the defendants; the injury to the public; the defendants' ability to pay; the extent to which defendants have benefitted from the violations, *United States v. Swingline, Inc.*, 371 F.Supp. 37, 46 (E.D.N.Y.1974); and the need to vindicate the authority of the Commission, *Consolidated Foods*, 396 F.Supp. at 1357. *See J.B. Williams*, 498 F.2d at 438; *United States v. Reader's Digest Association, Inc.*, 494

F.Supp. 770 (D.Del.1980), *aff'd*, 662 F.2d 955 (3d Cir.1981), *cert. denied*, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982); *United States v. Louisiana-Pacific Corp.*, 554 F.Supp. 504, 507 (D.Or.1982).

 1. *Good faith.* The good or bad faith of the violator is an important factor in assessing the appropriate penalty. *J.B. Williams,* 354 F.Supp. at 551. The conduct of Trotter and Kedzierski in entering the agreement to fix the price of paper cable by adhering to book price was willful and deliberate. This constitutes bad faith. *J.B. Williams,* 354 F.Supp. at 551; *United States v. Ancorp National Services, Inc.,* 367 F.Supp. 1221, 1224 (S.D.N.Y.1973), *aff'd,* 516 F.2d 198 (2d Cir.1975). In evaluating good faith for penalty purposes, however, the response of the entire corporate hierarchy to the obligations imposed by the Order must also be assessed. The degree to which the corporation took steps on its own initiative to assure compliance affects the judgment as to what penalty is necessary to induce a sufficiently vigilant posture. *See J.B. Williams,* 354 F.Supp. at 551.

 The managers of GK and Phelps Dodge failed to take sufficient steps to assure that their employees would abide by the Order. Harry Schell, President of the Phelps Dodge Cable & Wire Company during the relevant period, testified he was unaware of the existence of the Order until the FTC investigation began. Schell at 21. To Bruce Cowles, Vice-President of Cable & Wire, the Order "was kind of a surprise," Cowles at 70, as it was to Michael Cavanaugh, the company's National Marketing Manager, Cavanaugh at 16–18, 41, 74–75. Schell testified that upon learning of the Order he distributed it to Cowles, Cavanaugh, and Trotter, but both Cowles and Cavanaugh testified at their depositions that they had as yet not so much as seen it. Cowles at 70, 72; Cavanaugh at 74–75. Indeed, Cowles confessed at that time that he still did not know what the Order provided. Cowles at 72–73. Phelps Dodge proved it had an antitrust compliance program which dealt with the types of

behavior prohibited by the 1936 Order. Such a program does not excuse the failure of the company to apprise its employees of the need to conform their conduct to specific prohibitions of the Order, let alone the ignorance of its president and vice-president of its very existence. Moreover, though Schell testified he regularly advised his subordinates of the company's strict policy against improper contacts by issuing written directives, speaking to his sales and marketing people, and having the company's attorneys give talks, Schell at 30–31; *see* Cowles at 67; Priesing at 79–80; Memorandum of Phelps Dodge in Opposition to Motion for Partial Summary Judgment, Appendix A, these efforts could not have been very diligent. Cavanaugh testified he could not recall ever having received instruction as to antitrust compliance. Trotter remembered only a speech by counsel in 1970 or 1971, and a booklet issued in the early 1970's and recirculated in 1980, though he did believe at the time of the meetings with Penhale and Kedzierski that he was probably violating company policy. Trotter at 239–45, 223–24.

In addition, the company responded with insufficient vigor to tangible indications of Trotter's illegal conduct. In April 1976, when Phelps Dodge was considering a price increase for paper cable, Trotter showed Cowles a piece of paper he said had come in the mail indicating that competitors were contemplating a price increase. Trotter at 328–29; Cowles at 15–18. Cowles testified that he informed Schell and instructed Trotter to throw the paper away and to avoid using information from the paper. Cowles at 22–25. But he did not bother determining from which company the information came and why it was sent to Trotter. He could not say whether Trotter had actually discarded the paper. Cowles at 22–25. In August 1976, Trotter revealed to Cowles and Schell information about a competitor's bid to Con Ed. Cowles found it "unusual" for Trotter to have obtained such information, and Schell assumed it came from a competitor. Cowles at 18–19; Schell at 162–65, 181.

Trotter testified that he specifically told Cowles that he knew from Okonite that it had bid low on one item on the Con Ed bid. Trotter at 117–18, 224–25. Though they considered the matter of Trotter's illicit contacts "highly sensitive," after some discussion, Priesing, Schell and Cowles, responded only by withholding information on current bidding from Trotter, abruptly terminating his paper cable responsibilities, and transferring him to a position of similar responsibility in the Phelps Dodge Communications Division. Cowles at 22–24, 162–64; Priesing at 45, 48–50; Schell at 162–69; Trotter at 8, 124–25. Trotter was neither disciplined nor told specifically why he had been transferred, and virtually no investigation ensued, even though the limited inquiries undertaken made it appear increasingly probable that the source of the information was improper communication. Trotter at 125–26; Cowles at 164–65; Schell at 168, 171–72.

GK displayed no greater solicitude for the mandates of the Order. Kedzierski testified that during his tenure as product manager for paper cable he received no instruction to refrain from contacts with competitiors, and Brooks and Kedzierski were completely ignorant of the Order's existence. Although no direct evidence exists that anyone above Brooks in the corporate hierarchy actually learned of Kedzierski's activities during the conspiracy, GK's management nevertheless failed to fulfill its affirmative obligation to ensure compliance. Furthermore, Brooks' level of responsibility as Marketing Manager of the Power and Control Division of General Cable was significant, and he virtually acquiesced in Kedzierski's activities. Brooks conceded that, though aware of Kedzierski's contacts with competitors, he conveyed to him at most a "sort of mild discouragement, but . . . didn't direct him not to nor . . . strongly discourage him not to have those dialogues or that communication." Brooks at 96. He explained that he "did nothing actively to stop" these contacts because he believed they might benefit both his company and the industry. Brooks at 131; see id. at 89–98, 129–31.

Brooks attributed his passivity, moreover, to "the environment," observing that he "didn't think [an agreement to stick to the new prices] was something that was so unusual or so blatantly improper or illegal," Brooks at 133, thus demonstrating the need for a compliance program geared as much to the specific proscriptions of the Order as to the overriding mandates of the antitrust statutes. GK's attitude toward the Order seems accurately reflected by its argument that "[p]lainly, an order which is forty-six years old and which relates to an all but extinct industry is hardly something a corporation can reasonably be expected to give prominent attention to." Reply Memorandum of GK on the Issue of Civil Penalty at 11.

■ Corporate management can and must do far more than did the managements of GK and of Phelps Dodge to establish a good-faith attempt to prevent violations of a cease-and-desist order. For example, in *United States v. Ancorp National Services, Inc.*, 367 F.Supp. at 1224–25, the court found that defendant, which operated hundreds of newstands, had violated the terms of an FTC cease-and-desist order which prohibited it from receiving from suppliers price adjustments not generally available to its competitors. The court imposed a substantial penalty on the corporate defendant in large part because it found that, with the exception of a single memorandum circulated by the president to corporate officers instructing them to review the order and to report any potential violations, "[t]here was no evidence . . . of any . . . action taken by any officer of [the corporation] to assure compliance with the FTC order," *id.* at 1224; the record instead indicated that the defendant had "ignored" the order, *id.* at 1225. Similarly, GK and Phelps Dodge maintained compliance programs so lax that their employees involved in paper cable, including senior executives, were ignorant even of the existence of the Order. Phelps Dodge management did not attempt to satisfy itself that no improper communications were occurring, even when suspicious circumstances came to light, and

the mid-level manager responsible for paper cable at GK, fully aware of such contacts, thought them so little outside the norm that they merited neither his close scrutiny nor any efforts to assure that they ceased. On this record, neither GK nor Phelps Dodge can claim it took the "energetic steps" to effect compliance necessary to a showing of good faith. *Swingline,* 371 F.Supp. at 44, 47 (quoting *Babee-Tenda v. Scharco Manufacturing Co.,* 156 F.Supp. 582, 587 (S.D.N.Y.1957) (civil contempt proceeding)); *see J.B. Williams,* 354 F.Supp. at 551 ("reckless disregard of the injunctions in the order" warrants penalty "at or near the maximum prescribed"); *In re Dolcin Corp.,* 247 F.2d 524, 534–35 (D.C. Cir.1956) (decree "imposed an affirmative obligation ... to take all reasonable steps to effect compliance with [the] court's order," which officers "could [not] discharge by remaining inert"), *cert. denied,* 353 U.S. 988, 77 S.Ct. 1285, 1 L.Ed.2d 1143 (1957); *United States v. Johnson,* 541 F.2d 710, 712 (8th Cir.1976) *cert. denied,* 429 U.S. 1093, 97 S.Ct. 1106, 51 L.Ed.2d 539 (1977) (chief executive officer of company found liable for civil penalty for violation of cease-and-desist order by his salesman; good faith effort to fulfill "affirmative duty" imposed by this order not established where record showed that he failed to do "everything in his power ... to assure compliance with the F.T.C. order").

■ 2. *Public harm.* Substantial public harm inheres in an agreement to fix prices. Perhaps no other conduct so directly contravenes the public interest in a free, competitive economy. The Supreme Court long ago placed price-fixing beyond the reach of the rule of reason by declaring such conduct a per se violation of the antitrust laws, *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), and Congress has made it a felony, 15 U.S.C. § 1. Similarly, the Order had the purpose of protecting the public from practices deemed anticompetitive by the Commission. Violation of the restrictions embodied in the agreement therefore presumptively harmed the public regardless of the quantum of financial loss.

Moreover, ample evidence of actual harm exists in this case. The defendants artificially inflated the price of paper cable and contaminated a series of major competitive bids during the summer of 1976. The increased costs of paper cable presumably led to lower earnings for the utilities that purchased the paper cable and increased utility charges to consumers. These indirect effects constitute public harm. *See Swingline,* 371 F.Supp. at 47 ("suppression of competition" significantly affects public interest).

■ 3. *Benefits derived by defendants.* To accomplish the statutory purpose of deterring violations, a penalty must ensure that disobedience does not pay. As a general rule, an offender should be deprived of any benefit derived from violating an FTC order, and common sense suggests that courts consider multiplying the amount of benefit by a factor representing the likelihood of detection. *See* Diver, *The Assessment and Mitigation of Civil Money Penalties by Federal Administrative Agencies,* 79 Colum.L.Rev. 1435, 1466–67 (1979).

The record contains insufficient evidence from which to determine accurately the benefit derived by GK and Phelps Dodge from the illegal agreement. The government contends that this dearth of information results from the claim of GK and Phelps Dodge that they have no knowledge of particular sales during the relevant period. The companies have submitted little detailed analysis of how the price increases attributable to the conspiracy affected their sales figures or profit margins, choosing instead to repeat their contention that the agreement had no impact on corporate pricing decisions. A memorandum written by Roger Brooks of GK the day after Phelps Dodge issued its new price sheets on paper cable in late May 1976, evaluated their likely effect. *See* Government Response on Liability, Exhibit I. Brooks concluded that "[g]enerally, if these levels are adhered to in the marketplace, they will represent an increase of 12–30 percent ver-

sus the past four (4) months [sic] quotation levels." Based on sales reports generated by GK, the government argues that GK had paper cable sales of $3,494,000 between June 1, 1976, and September 30, 1976, the government's proposed violation period. Applying Brooks' percentage estimate to the GK sales figures, the agreement would be found to have produced additional revenue to GK of between $419,280 and $1,048,200. The government suggests, moreover, that this range actually understates the revenues GK derived. Absent the conspiracy, the government argues, the downward trend in prices in early 1976 would have continued, driving down revenues from the level from which Brooks drew his figures. The government also urges that the time value of money should be taken into account.

 GK derides the "amateur economics" of the government's approach, but provides little assistance in outlining an alternative. It points out that the government analysis employs total sales figures for the June-September period; but GK makes no attempt to differentiate between revenue from affected bids and revenue from other sources, although it has the resources and access to information necessary to provide such an analysis. GK also points out that its paper cable division actually lost $5 million in 1976, due in large part to dramatically increased costs, and that losses increased in 1977 and early 1978, when it decided to sell the division. This demonstrates nothing, however, as a reduced loss is at least as great a benefit as an increased profit.

The government proposes that its analysis as to GK should apply to Phelps Dodge as well. Little if any price competition existed between defendants during the conspiracy period, similar market conditions prevailed, and the three major producers had approximately equal market share of paper cable at the time. Phelps Dodge confirms the ball-park accuracy of the government's proposed analysis. It estimates that as a result of the May 1976 price increase it gained "at most roughly $800,000, and probably substantially less." Phelps Dodge Memorandum on Issue of Civil Penalty at 25–26.

 GK and Phelps Dodge emphasize that they have each contributed over $2 million to the settlement of the private class action brought by paper cable purchasers, an amount greater than the highest reasonable estimate of increased profits resulting from the price increase. Thus, they contend, they already have disgorged any illegal gains obtained and cannot be said to have retained a benefit from their improper behavior. The cases relied upon by GK and Phelps Dodge, *Swingline*, 371 F.Supp. at 47, and *United States v. Papercraft Corp.*, 426 F.Supp. 916, 919 (W.D.Pa. 1977), both deal with costs incurred in complying with FTC orders. Neither supports the proposition that a corporation which incurs liability for civil penalties should receive credit for funds paid in settlement of private suits arising under different statutes but grounded in the same or related transactions. Moreover, the private paper cable plaintiffs founded their action on a series of transactions beginning well before the period to which the government has limited its claim. Nevertheless, while a setoff would be inconsistent with the Supreme Court's recognition that the Sherman and FTC Acts provide "cumulative remedies against activity detrimental to competition," *FTC v. Cement Institute*, 333 U.S. 683, 694, 68 S.Ct. 793, 800, 92 L.Ed. 1010 (1948), the civil payments made may properly be considered in evaluating what additional penalty could reasonably be required to deter conduct of the sort proscribed.

 4. *Ability to pay.* Phelps Dodge has provided information on a recent and severe downturn in the economic fortunes of its parent corporation. *See* Phelps Dodge Memorandum on Civil Penalties, Appendix C; Additional Materials Regarding Financial Condition of Phelps Dodge Corporation. Otherwise, the companies for the most part only briefly address the criterion of ability to pay, likely because they recognize that each is undoubtedly able to pay

any penalty that could reasonably be assessed in this case. GK in 1980 had net sales of $1.18 billion; total assets of $732 million; net profits of $70 million; working capital of $227 million; and $19.9 million on hand in cash and negotiable instruments. Phelps Dodge in 1981 had economic net sales of $1.438 billion; total assets of $2.144 billion; net profits of $58.5 million; total current assets of $473 million; net stockholders' equity of $1.089 billion; and $15.4 million on hand in cash and other negotiable instruments.

5. *Vindication of FTC authority.* This consideration underlies all proceedings brought to recover civil penalties. Though the Order violated is old, it has remained fully in effect. Further, it deals with matters central to the FTC's mission to preserve a competitive economy and protect the public from unfair practices, for price-fixing poses a "threat to the central nervous system of the economy." *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 845 n. 59, 84 L.Ed. 1129 (1940). GK's departure from the industry by virtue of the sale of its paper cable division does not remove this factor, nor does it eliminate the need for general deterrence. The efforts of GK and Phelps Dodge to divorce themselves from the conduct of their employees suggest, in fact, that vindication is an important consideration here. The penalty assessed must provide a " 'meaningful deterrence' … without being overly punitive." *Reader's Digest,* 494 F.Supp. at 779 (quoting *ITT Continental,* 420 U.S. at 232, 95 S.Ct. at 932). It "should be large enough to hurt, and to deter anyone in the future from showing as little concern as [GK and Phelps Dodge] did for the need to [comply]." *Swingline,* 371 F.Supp. at 47.

6. *Okonite settlement as guide.* On November 20, 1979, Okonite, a codefendant in this suit, agreed to pay $300,000 in five equal annual installments to settle the government's claims. Phelps Dodge offers an expert economic analysis that places a real value on that settlement of $251,000, and suggests that, in light of the

purportedly greater culpability of Okonite, Phelps Dodge should be assessed a considerably lesser civil penalty. In fact, the Okonite settlement offers little guidance in assessing appropriate penalties for Phelps Dodge or GK. Penhale held a higher executive position in Okonite than did Trotter or Kedzierski in their respective companies, and had virtually autonomous authority to develop corporate pricing policy and to set specific bid prices. Penhale at 14–15, 42. But Okonite, a smaller company than its competitors, employed no manager in a position equivalent to that held by Penhale's coconspirators. In addition, the record fails to support Phelps Dodge's argument that Penhale masterminded the scheme and that Trotter and Kedzierski were willingly manipulated by him in the hope that he might secure them employment in the future. The very nature of a settlement agreement, moreover, precludes a precise assessment of its value. By settling, both the government and Okonite waived the opportunity systematically to present evidence on the issues of liability and good faith which inform the discretion of this court in assessing a penalty. Further, the settlement figure of a codefendant of roughly equal culpability should if anything serve as a floor, not a ceiling. Settlement involves negotiation and compromise; the parties avoid the burdens, expense, and risks of litigation, but forego the possibility of fully vindicating their positions. Incentive to settle would be reduced if figures arrived at in negotiated settlements were used as a cap on the liability of a codefendant which chose unsuccessfully to defend.

Finally, the government claims the Okonite settlement is worth far more in present value than defendants' estimate of $251,-000. That estimate, the government contends, is premised on overly favorable assumptions as to bond rating and interest rates, and on a failure to add the time value of money since the settlement several years ago. A figure close to half a million dollars would more fairly represent the value of the Okonite settlement at this time. The Okonite settlement also no doubt reflected the fact that the company is several

times smaller than either Phelps Dodge or GK and had been spun off from its bankrupt parent and purchased by its employees just prior to the agreement. Therefore, to the extent the Okonite settlement should serve as a guide, the defendants' roughly comparable culpability, the present value of the settlement, and the significantly smaller size of Okonite would suggest that a civil penalty of at least $500,000 against each codefendant would be appropriate.

7. *Conclusion.* The government asks for a civil penalty of $900,000 against GK and of $825,000 against Phelps Dodge, explaining the differential on the basis of the active acquiescence of Brooks at GK, the cash flow problems of Phelps Dodge, and Phelps Dodge's action in terminating Trotter's involvement in paper cable. GK and Phelps Dodge contend that only nominal penalties are appropriate.

■ The findings and conclusions reached above warrant the imposition of substantial civil penalties. The companies engaged through responsible employees in outright price fixing, and gained significant additional revenues from the collusive agreement to adhere to book pricing. Both companies failed to demonstrate good-faith efforts actively to comply with the Order, and Phelps Dodge took only marginally more effective measures than GK to satisfy its obligations. Notwithstanding Phelps Dodge's recent difficulties, both companies are able to bear substantial penalties, the imposition of which appear to be necessary here to affirm the principle that FTC orders do not fall into desuetude with age.

An assessment in the full amount claimed by the government seems inappropriate, however, because the defendants already have paid considerable sums to civil plaintiffs, and because no evidence was developed that indicated intentionally wrongful conduct by the highest officers of either corporate defendant. Accordingly, civil penalties of $7,500 per day against Phelps Dodge and $8,000 per day against GK for each of the sixty-nine days during which the conspiracy lasted are assessed. Thus,

Phelps Dodge is liable for a civil penalty of $517,500, and GK of $552,000, with costs. The Clerk will enter judgment accordingly.

SO ORDERED.